## UNITED STATES v. FARRELL et al.

District Court, D. Connecticut. August 29, 1929.

No. 1783.

John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn., and C. M. Charest, Gen. Counsel Bureau of Internal Revenue, Ralph E. Smith, and D. Louis Bergeron, Sp. Attys. Bureau of Internal Revenue, all of Washington, D. C., for the United States.

Henry F. Parmelee, of New Haven, Conn., Norman C. Beers, of Danbury, Conn., and Avery Tompkins, of New Haven, Conn., for defendants.

THOMAS, District Judge. The United States brings this bill in equity against the liquidating stockholders and directors of the Danbury Company, a corporation organized under the laws of Delaware to recover the income and excess profits tax assessed against the company for the year 1919 in the amount of $11,928.16.

The corporation was organized in 1900 and leased a hat manufacturing plant including land, building, machinery, and equipment which it purchased in 1901 for about $15,000. It continued to manufacture and sell hats until May of 1917, when it ceased operations. The plant remained idle until November 25, 1919, when it was sold for $60,000. On November 4, 1920, the company dissolved and distributed all of its assets among the defendants, each of whom received the sum of $14,500 in cash as a final liquidated dividend.

Farrell, one of the defendants, is also the executor of Herbert R. McChesney, who was one of the three stockholders. For the sake of convenience I shall refer to all of the defendants at bar as the liquidating stockholders.

On March 13, 1920, the Danbury Company filed a corporate income and excess profits tax return for the calendar year 1919, from which it appeared that the gross income from its operations was $93,430.62. Deductions, without making adjustments for depreciation during that year, were $45,981.64, and the net income from operations was stated to be $47,488.98, from which was deducted a loss from the sale of capital assets of $24,603.61, leaving a net taxable income of $22,845.37. Thereafter, and on December 20, 1923, the Commissioner of Internal Revenue made an additional assessment for the year 1919 in the amount of $11,928.16. In this determination the commissioner found that the gross income from operations was $93,092.22, from which deductions were made of $49,196.31 including $4,608.80 depreciation sustained due to wear and tear from January 1, 1919, to the date of sale in November, 1919, leaving a corrected net income from operations of $43,895.91. This net income was about $3,500 less than the net income reported by the company. The commissioner further determined that there was a net gain from the sale of assets in the sum of $2,271.29, which, added to the net income from the operations, made a corrected net taxable income of $46,167.20. The invested capital for the year 1919 was calculated at $90,526.55, and the excess profits credit as $10,242.10, and the total income and profits tax was computed to be $15,934.38, upon which $4,006.22 had already been paid, leaving the balance of $11,928.16, which is the amount alleged to be due in this suit.

The controversy between the parties relates primarily to the question as to whether or not there was a net gain as a result of the sale of the capital assets or whether there was a loss. It seems to be conceded that in determining whether or not a sale price nets a gain or loss the following elements must be taken into consideration, viz.:

First, the cost of the thing sold;

Second, the value of its depreciation from the time it is bought until the time it is sold; and

Third, the sale price.

The value of the depreciation is to be deducted from the cost price, and this in turn, when deducted from the sale price, gives the true measure of the net gain.

With this concession as to principles, all agreement between the parties ceases. The defendants contend that in the instant case there was no real depreciation whatever; that the theoretical depreciation usually assumed in all accounting practice must yield to the actual facts and that the actual facts at bar disclose that the assets sold were in a state of "arrested depreciation"; and that therefore the price for which the assets were sold cannot be augmented by depreciation.

It may be well, at the outset, to determine some questions which seem to me to have been touched upon somewhat obliquely by the parties in the conduct of the case. To start

with, we must bear in mind that this is not a suit at law by the government against the taxpayer. It is an action in equity in the nature of a bill by a cestui to enforce the performance of a trust. The defendants at bar are charged as trustees of the corporate assets, distributed to them upon the final liquidation of the corporate affairs, and the plaintiff sues as a corporate creditor at large. I doubt whether, in such an action, the United States is in a position different from that of any other creditor at large.

▉ The practical problem involved in this distinction arises from the fact that in an ordinary action by the government against a taxpayer, the determination of the Commissioner of Internal Revenue is prima facie valid and the burden is upon the taxpayer to show its invalidity. This displacement of the burden of proof necessarily implicates important practical consequences. Did the government, in the case at bar, have a right to rely upon the rule established and recognized in ordinary tax cases?

Upon mature reflection I am constrained to answer this question in the affirmative. It is obvious that if the government had brought its action against the corporation in the first instance, it would have had a right to establish its case in the usual manner and if, upon the evidence in this wise introduced, it had obtained a judgment against the corporation, it seems to me that such a judgment would have been conclusive against the liquidating stockholders. The liquidating stockholders could not have complained that the judgment had been established under a rule of evidence quite different from that ordinarily applicable. If, in order to avoid the waste and expense of circuity of action, the government brings its action directly against the liquidating stockholders, it does not seem that any different reason exists why it should be subjected to a different rule in the establishment of its case. That which would have bound the defendants in the first instance should bind them now. I now turn to the merits.

I find that in the year 1919 the total cost of the buildings, construction, and machinery from the time of the acquisition thereof was the sum of $100,744.51. I find that the total cost of this plant in 1913 was $79,458.22. I find, therefore, that between the years 1913 and 1919 an additional sum of $21,286.29 was expended in the purchase of the plant. I find, further, from the evidence of the tax returns filed by the corporation from the years 1913 to 1919, inclusive, that there was a claimed depreciation of $43,036.18. It must be obvious that this depreciation could not be claimed upon the additional assets purchased for the $21,286.29. It must have been claimed upon the total plant.

The Commissioner of Internal Revenue has found that the total value of the buildings in 1913 was $27,275.35 and of the machinery and equipment was $26,751.64, making a total of $54,026.99.

I am not disposed to disturb these figures. To my mind there is nothing unreasonable in the criteria employed by the Commissioner of Internal Revenue in determining the depreciation in the years 1901 to 1913, and in the absence of any claim of arrested depreciation, the result reached by the commissioner could hardly be deemed unexpected. This claim of "arrested depreciation" is based upon the assertion that the amount expended for replacement and repairs was so large as in fact to arrest the march of depreciation. There is practically no evidence of any kind to substantiate this. The appraisal introduced in evidence by the defendants made by the Standard Appraisal Company in 1916 is, for the purposes of determining the value of 1913, wholly useless. I am constrained to regard the entire report as incompetent and strike the same from the record.

We have no evidence in the record as to the proportion which repairs bore to costs prior to 1906. From 1906 on, however, the proportion has been calculated and tabulated, and is as follows:

1906, 9.5 per cent.
1907, 8.2 per cent.
1908, 5.9 per cent.
1909, 6.6 per cent.
1910, 3.0 per cent.
1911, 2.7 per cent.
1912, 2.3 per cent.
1913, 1.9 per cent.
1914, 1.6 per cent.
1915, 0.6 per cent.
1916, 2.3 per cent.
1917, 0.9 per cent.
1918, 0.2 per cent.
1919, 0.3 per cent.

These percentages indicate no extraordinary or unusual expenditures for repairs and replacements charged to expenses. They have, of course, nothing to do with capital investments, which have been charged to cost. From figures such as these it is quite impossible to draw the conclusion, in the absence of any other definite concrete evidence, that the plant and equipment were in a state of "arrested depreciation" during these years.

■ Nor do I see any reason why the very claims for depreciation made by the corporation itself should not be regarded as admissions against interest requiring explanations by these defendants. In their brief, counsel say: "Complainant makes much of the fact that the Danbury Company took extensive deductions for depreciation on its annual tax returns. The distinction between allowances for the purpose of determining annual net income is wholly different from establishing a gain or loss in the final sale of assets."

Presumably counsel intended to assert that the word "depreciation," when used to justify a claimed annual deduction from gross income, is one thing, and that it means something else when a computation of shrinkage in value is to be made upon the sale of capital assets. Just when, where, and how such a distinction came about, and just what the distinction is, does not appear. It seems to me that depreciation is depreciation, and that when a taxpayer claims that his assets have depreciated he then concedes that fact.

The actual amount of depreciation claimed from 1909 to 1912, inclusive, was $23,000. When that sum is subtracted from $79,458.22, which was the total cost of the plant in 1913, we have a balance of $56,458.-22, which is close enough to the depreciated cost found by the commissioner to warrant sustaining his findings. Furthermore, it must be remembered that the depreciation thus claimed was for four years only, whereas the commissioner's calculation of depreciation covered the entire period of ownership antedating 1913.

The total additions from 1913 to 1919, inclusive, amounted to $21,286.29. Now, during this period $43,036.18 was claimed as the amount of depreciation. If we add the depreciated cost of the assets of 1913 to the cost of the capital assets added during the years 1913–1919, we arrive at the sum of $75,313.28; and if we deduct from this the total amount of depreciation claimed during 1913–1919, we find that the depreciated cost would be $32,277.10, which, augmented by the value of the land, gives a total of $39,-676.20, which sum is substantially below the depreciated cost found by the commissioner. Of course, it is true that the amount claimed by the corporation by way of depreciation is not necessarily the amount at which it should have been determined; but it seems to me that such a claim, set forth in a tax return as an alleged fact, verified under the oath of the corporate officers, has at least the evidentiary value of an admission against interest. It does not conclude the taxpayer, but it certainly does constitute evidence against him.

■ Under the circumstances, therefore, I find no ground for concluding that there is anything unreasonable or arbitrary in the application made by the Commissioner of Internal Revenue of his standards of depreciation. Some confusion may be engendered by reason of the failure to distinguish between that portion of the capital assets acquired subsequent to 1913 and that portion acquired prior to 1913. The government submits that no gain or loss is recognized in the case of property acquired before March, 1913, and sold or disposed of at more than cost but less than its fair market value as of that date. Now, the property which was sold in 1919 was not altogether the same that was purchased prior to 1913. There had been additions to structure and machinery in the interval from 1913 to the date of sale. The sale price of $60,000 comprehended all the assets purchased prior to the date of sale, and no practical method now exists for determining what portion of this sale price of $60,000 should be allocated to the structure and equipment existing in 1913 and intact in 1919, and what portion should be allocated to the balance. Under such circumstances it is wholly impracticable to apply this rule to the case in hand.

I therefore find that the return as redetermined by the commissioner and the additional tax assessed thereon are sustained, and that the plaintiff should have a decree accordingly.