284 F.2d 1
 SUNKIST GROWERS, INC., a Corporation, and The Exchange
Orange Products Company, a Corporation, Appellants,
v.
WINCKLER & SMITH CITRUS PRODUCTS CO., a Corporation, and
Ronald Walker,Trustee, Appellees.
 No. 15242.
 United States Court of Appeals Ninth Circuit.
 Sept. 30, 1960.
 
 Ross C. Fisher, Herman F. Selvin, Los Angeles, Cal., Thomas C. Strachan, Jr., Frank F. Fowle, Melville C. Williams, Chicago, Ill. (Farrand, Fisher & Farrand, Los Angeles, Cal., Loeb & Loeb, Los Angeles, Ca., Pope & Ballard, Chicago, Ill., of counsel), for appellants.
 William C. Dixon, Los Angeles, Cal., Holmes Baldridge, Chicago, Ill. (Harry M. Irwin, Los Angeles, cal., of counsel), for appellee.
 Before STEPHENS, BARNES and MERRILL, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 This is a private action for treble damages under the Sherman Act, 15 U.S.C.A. 1-7, 15. Appellants are Sunkist Growers, Inc., a corporation (hereinafter referred to as Sunkist) and The Exchange Orange Products Company, a corporation (hereinafter referred to as Exchange Orange of EOP). Appellees are Winckler & Smith Citrus Products Co., a corporation and Ronald Walker, as trustee of Winckler & Smith (hereinafter referred to as Winckler or Trustee). The action was tried in the district court before a jury, which returned a verdict of $500,000. This was trebled to $1,500,000, and from that there was deducted the $2,500 originally paid in compromise by one-time defendant TreeSweet. There were added attorneys' fees fixed at $195,000, and costs. Timely appeal was filed in this Court. After argument, but before decision, one of the judges hearing this appeal died. It was thereupon set down for hearing a second time, was heard, and held pending the determination by the Supreme Court of Maryland and Virginia Milk Producers Ass'n v. United States, 1960, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880, having to do with the antitrust exemptions of agricultural marketing cooperatives.
 
 
 2
 * Parties
 
 
 3
 Sunkist Growers, Inc., a corporation, was sued in the district court originally under its former name, California Fruit Growers Exchange. It is and has been a nonprofit agricultural cooperative marketing association. The second defendant, The Exchange Orange Products Company, a corporation, was sued in the court below as The Exchange Orange Products Company. At all times it was a wholly owned subsidiary of Sunkist. Together with Sunkist and Exchange Orange, there was originally named as a defendant Exchange Lemon Products Company, a corporation, sued originally as Exchange Lemon Products Company, a nonprofit corporation (hereinafter sometimes referred to as ELP or Exchange Lemon).
 
 
 4
 On motion of plaintiff, Exchange Lemon was dismissed with prejudice as a defendant, and was subsequently named as a co-conspirator in plaintiff's second amended complaint filed February 2, 1956, to conform to proof.
 
 
 5
 TreeSweet Products Company, a corporation (hereinafter referred to as TreeSweet) was an original defendant, but settled for $2,500, and was dismissed as a defendant. In the said second amended complaint, it was referred to as a co-conspirator.
 
 
 6
 E. A. Silizle Corporation, a corporation (hereinafter referred to as Silzle) was never a defendant but was named a co-conspirator in both plaintiffs' first and second amended complaints.
 
 
 7
 Appellee Ronald Walker is trustee of the estate of Winckler & Smith Products Co. in those proceedings pending in the district court below for its reorganization under Chapter X of the Bankruptcy Laws, 11 U.S.C.A. 501 et seq., being Number 538860-C of the records of said court. Mr. Walker was appointed March 26th, 1952 as such trustee, and by order made May 9, 1952 he was permitted to and did intervene in this case. Mr. Walker is sometimes referred to herein as appellee, Walker, Trustee, or as Intervenor
 
 
 8
 Thus on this appeal there are two appellants, Sunkist and EOP, and two appellees, the Winckler corporation and the Trustee.
 
 II
 The Theory of the Case
 
 9
 Appellees allege in their first cause of action (Section 1 of the Sherman Act; 15 U.S.C.A. 1), and appellants deny, that appellants have conspired and entered into contracts which had the purpose and effect of unreasonably restraining interstate commerce in canned California citrus fruit juice, particularly single strength orange juice. This was proved, say appellee, by 'six acts.' These were:
 
 
 10
 (a) In the 1950-1951 canning season ELP processed 28,812 tons of oranges for EOP at cost, and without profit to ELP. Appellants admit this.
 
 
 11
 (b) During the same period, EOP processed 1,740 tone of lemons for ELP on the same basis. Appellants admit this.
 
 
 12
 (c) Sunkist and EOP agreed to establish and maintain the price of by-product oranges available to independent processors like appellees at a level making it impossible for processors like appellees to purchase oranges from EOP, or any other source, at a price or under any other arrangement enabling appellees and other processors to produce and sell canned natural orange juice and frozen concentrate juice at prices competitive with prices charged by appellants and their favored customers, TreeSweet and Silzle. Appellants deny these allegations.
 
 
 13
 (d) Under a contract effective July 23, 1951, between EOP and TreeSweet, TreeSweet received oranges from EOP, made single strength orange juice for EOP at cost and without profit to TreeSweet, and then bought the orange juice from EOP at Sunkist's then published price for single strength orange juice, less certain discounts not available to other customers, including appellees. The purpose and effect of this contract allegedly was to enable TreeSweet to obtain orange juice at a cost which prevented appellees from competing with Sunkist or TreeSweet in the natural orange juice market. Appellants admit the contract and supplying the oranges; deny the balance.
 
 
 14
 (e) Under a contract effective June 26, 1951, between EOP and Silzle, EOP furnished oranges to Silzele at $22.50 per ton, which was lower than the price to appellees or other processors. The purpose and effect allegedly was to give Silzle oranges at a price with which appellees could not compete. Appellants admit the contract and furnishing the oranges; deny the purpose or effect.
 
 
 15
 (f) EOP refused appellees a TreeSweet or Silzle type contract in 1951. Appellants denied the refusal but admitted such a contract was not made.
 
 
 16
 Appellees allege that as a result of the above acts of appellants (listed in (a) to (f) above), and the monopoly control of Sunkist and Exchange Orange in 1951 over the amount and price of Valencia oranges available for processing, appellees were unable to process natural and frozen concentrate fruit juice in competition with Silzle, TreeSweet and Sunkist, which alleged facts eliminated appellees as a competitor, and forced the filing of proceedings under Chapter X of the Bankruptcy Act. These allegations were added in the second amended complaint filed after the close of evidence. They were materially different from those in the original complaint. Appellants deny all these allegations.
 
 
 17
 Under the second cause of action (brought under 2 of the Sherman Act; 15 U.S.C.A. 2) it was charged that acts (a) to (f) above were done by appellants with monopoly control over citrus fruit markets in California and Arizona, and in so doing and in making such contracts, the parties maned conspired to monopolize, and monopolized, single strength Valencia orange juice.
 
 
 18
 The second amended complaint additionally alleged contracts with independent processors Hyland-Stanford and Mission Dry, giving them first call on oranges and and processing to the exclusion of Independent Fruit Growers' Association and Morgan Ward, it selling agent, and one of the appellees' principal suppliers of by-product oranges.
 
 Appellants plead five separate defenses:
 
 19
 First: The second amended complaint, the amended complaint, and the original complaint each failed to state a claim upon which relief could be granted.
 
 
 20
 Second: The applicable statute of limitations, Section 338(1) of the Code of Civil Procedure of California, bars all causes of action asserted in the second amended complaint and in the amended complaint.
 
 
 21
 Third: All causes of action alleged in the second amended complaint and the amended complaint are barred by the laches of appellees, in that appellees are barred by laches and estopped from relying upon any acts involving Silzle, as the Silzle contract was disclosed to appellees on March 14, 1952, and appellees did not amend their complaint to include this contract until December 15, 1954, and such a long delay was prejudicial to appellants.
 
 
 22
 Fourth: Appellees are barred by laches and estopped from relying on the Hyland-Stanford and Mission Dry contracts first referred to in the second amended complaint, as these contracts were disclosed to appellees on November 9, 1955, and appellees did not amend their complaint to refer to the Hyland-Stanford contract until January 31, 1956 (during the last few days of the trial) or to the Mission Dry contract until February 4, 1956 (after all the evidence was in), and such long delay was prejudicial to appellants.
 
 
 23
 Fifth: Appellees are barred by laches and estopped from alleging the new matters in the last paragraph of III(f) of the first cause of action (referred to in (f) above), because appellees knew of such matters through discovery long before trial and did not seek to amend its complaint to refer thereto until January 31, 1956, to appellants' surprise and prejudice, and such long delay was prejudicial to appellants.
 
 
 24
 This is a long record before us, and the matter is as complicated, both factually and legally, as is most antitrust litigation. We attempt to summarize the appellees' position by first stating what it was not. It was not appellees' position that appellants did not have certain exemptions from the antitrust laws under the Clayton and Capper-Volstead Acts, 15 U.S.C.A. 12 et seq.: 7 U.S.C.A. 291, 292, nor that they could not, as agriculturists, join together to make marketing agreements. It was appellees' position that such exemptions so granted were not absolute. Appellants could monopolize by-product oranges or single strength orange juice, either in the national market or in the California-Arizona area market, provided they achieved their monopoly position lawfully. Appellants could set any price they desired for their juice. They could make any 'true' processing contracts with TreeSweet and Silzle, or with anyone else. They could refuse to make oranges available to appellees, if activated by 'proper' business motives, as distinguished from 'improper' motives.
 
 
 25
 Appellees insist, however, that appellants having monopolized by-product oranges from which single strength juice was made, and by such monopolization having control over the amount of by-procuct oranges available to independent contractors; having further set a price of $40.00 per ton for such oranges (a price alleged to have been one at which no independent processor could buy, process and compete with Sunkist in the single strength juice market); having at the same time (i.e., during the one year of 1951, here involved) made oranges available to TreeSweet and Silzle, competitors of appellees, under so-called 'processing' contracts which were more than that because they permitted the competitors to secure oranges at a price substantially lower than $40.00 per ton; the appellants were thus guilty of a conspiracy or combination unauthorized by antitrust law, even as modified by the limited agricultural marketing exemptions.
 
 
 26
 Under this theory of the case, the court sought to leave with the jury several questions of fact, namely:
 
 
 27
 (1) Whether appellants had a legal monopoly of by-product oranges (and a resulting legal monopoly in single strength orange juice) in the California-Arizona market.
 
 
 28
 (2) Whether, it appellants did have such legal monopoly, it was used legally or illegally, in the particulars alleged.
 
 
 29
 (3) Whether such monopoly, if proved, gave appellants power and control over single strength orange fruit judice prices in the California-Arizona market.
 
 
 30
 (4) Whether such power and control, if proved, was used with the purpose or with the effect of eliminating a competitor in such market, i.e., eliminating appellees.
 
 
 31
 (5) Whether such power and control, if proved, was sufficient to enable appellants to determine the price or the terms and conditions under which by-product oranges were available in 1951 to independent processors, including appellees.
 
 
 32
 (6) Whether appellants had conspired with non-defendant co-conspirators to unlawfully use their market power and control to appellees' alleged consequent injury, or whether appellants had unlawfully used such monopoly power and control to appellees' injury.
 
 
 33
 (7) What damages were proximately caused by appellants' alleged actions.
 
 
 34
 With this explanation of our understanding of the theory of the case, we pass to:
 
 III
 Questions Raised On This Appeal
 
 35
 There are four principal questions raised on this appeal: Was any violation of antitrust laws made out? Was there error in instructing or refusing to instruct the jury? Was there error in rulings on admission and rejection of evidence? Was there error in affixing attorneys' fees of $195,000? We shall discuss each in turn.
 
 
 36
 A. Was any violation of antitrust laws made out?
 
 
 37
 1. The Exemption of Agricultural Cooperatives Generally
 
 
 38
 There can be no con be no conclusion as to the first error alleged until we determine the nature and extent of the exemption granted by law to agricultural cooperatives. This was rased by the pleadings and particularly, appellants' first and separate defense.
 
 
 39
 Sunkist was a nonprofit agricultural cooperative marketing association. So was EOP, a subsidiary of Sunkist. So was ELP, an association of growers who were likewise members of Sunkist.
 
 
 40
 The Exemption claimed by appellants rests within 6 of the Clayton Act and 1 of the Capper-Volstead Act. Section 6 of the Clayton Act (38 Stat. 731 (1914), 15 U.S.C.A. 17) reads as follows:
 
 
 41
 'The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects hereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.'
 
 
 42
 Section 1 of the Capper-Volstead Act (42 Stat. 388 (1922), 7 U.S.C.A. 291) reads in material part as follows:
 
 
 43
 'Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in association, corporate or otherwise * * * in collectively processing, preparing for market, handling, and marketing in interstate * * * commerce such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes * * *.'
 
 
 44
 The legislative history of the Clayton and Capper-Volstead Acts makes it clear that farmers (including orange growers) were granted the right to combine, contract and conspire together in restraint of trade in associations which, without the exemptions, would have violated the Sherman Act. Its purpose was to permit the farmers to compete with large corporations.[1] But by its terms, the exemption was not absolute-- the individuals were permitted to associate in groups and the associations were permitted specifically to do but two things: arrange 'marketing agencies in common' and contract and agree with their members participating, if necessary to effect such purposes. As the most recent Supreme Court decision states:
 
 
 45
 'Thus, the full effect of 6 is that a group of farmers acting together as a single entity in an association cannot be restrained 'from lawfully carrying out the legitimate objects thereof', the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will.' Maryland and Virginia Milk Producers Ass'n v. United States, supra, 362 U.S. at pages 465-466, 80 S.Ct. at page 852.
 
 
 46
 There have been few cases dealing with the Capper-Volstead Act exemptions.[2] At the time this case was tried in the district court, United States v. Borden Co., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, was the leading case. It held that Capper-Volstead does not wholly exempt cooperatives, and particularly those conspiring with nonexempt legal entities. This same principle has been applied to labor unions, which have no absolute exemption from antitrust laws. Allen Bradley Co. v. Local Union No. 3, etc., 1945, 325 U.S. 797, 805, 65 S.Ct. 1533, 89 L.Ed. 1939. The Clayton Act, 6, applied only to nonstock agricultural cooperatives. Section 1 of the Capper-Volstead Act extended the same exemption to capital stock agricultural cooperatives.
 
 
 47
 'The general philosophy of both (acts) was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage-- and responsibility-- available to businessmen acting through corporations as entities.' Maryland and Virginia Milk Producers Ass'n v. United States, supra, 362 U.S. at page 466, 80 S.Ct. at page 853.
 
 
 48
 And in conclusion, Mr. Justice Black stated:
 
 
 49
 'The (Capper-Volstead) Act did not leave cooperatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative.' Id., 362 U.S. at page 467, 80 S.Ct, at page 854.
 
 
 50
 We conclude, therefore, that no blanket exemption is created by either Section 6 of the Clayton Act or Section 1 of the Capper-Volstead Act which permits an agricultural cooperative to either unlawfully monopolize, or attempt to monopolize, under Section 2 of the Sherman Act, nor to do any acts to restrain or suppress competition, or which result in the restraint or suppression of competition prohibited by Section 1 of the Sherman Act, if such acts, in either event, fall within the prohibitions of the respective Sherman Act sections. Thus the question as to whether there has been a violation of the antitrust laws is ordinarily one to properly go to the jury.
 
 
 51
 We next consider if there was proof of the violation of antitrust laws, despite the limited exemption the appellant Suntion enjoys, sufficient to make out a question of fact for the jury. To pass upon this, we must consider certain of the facts of this case in detail in an attempt to establish and define the product and the pertinent market with which we are here concerned.
 
 2. The Product Involved
 
 52
 As the case went to the jury, the defendants Sunkist and EOP were charged, as appellees' counsel put it on oral argument, with 'a combination and conspiracy (under Sections 1 and 2 of the Sherman Act) to restrain trade in California citrus juices and to monopolize the production, processing and sale of those juices, primarily, insofar as appellee is concerned, single strength juices.' The contracts charged to be in restraint of trade were allegedly made with the purpose of eliminating a competitor, the appellees.
 
 
 53
 In the first cause of action contained in appellees' amended complaint, the relevant market was designated as 'canned citrus fruit juice, produced and processed in the State of California, and marketed throughout the United States.' Thus originally all citrus fruit juice was involved; orange, lemon and grapefruit. By the amendment to the complaint to conform to evidence, the relevant market was restricted to 'single strength Valencia (orange) juice.'
 
 
 54
 In that respect it was alleged (again to conform to proof) that:
 
 
 55
 'A total of approximately 5,400,000 gallons of single strength Valencia juice was processed in California in 1951. Of this amount, defendants EOP, TreeSweet and Silzle processed approximately 4,511,202 processed approximately 4,511,202 mately 3,044,394 gallons were processed by TreeSweet and Silzle under the contracts and arrangement (complained of) * * *, Because of the monopoly control by Sunkist and EOP over the quantity and price at which Valencia product oranges were made available to independent processors of single strength juice other than TreeSweet and Silzle, and the aforesaid contracts, plaintiff was unable to and did not process any single strength Valencia juice in 1951.'
 
 3. The Relevant Market
 
 56
 The record discloses that entirely apart from the marketing of citrus fruit itself as the end product, an important consideration in the citrus industry is the utilization of by-products, such as oils from the peel, peel and pulp for cattle feed, and the juices themselves. Juices are divided in the trade into three categories: (1) The so-called 'hot concentrate juice' (the syrup base for mixed citrus drinks); (2) the cold, or so-called 'frozen concentrate,' which is used to prepare the canned or frozen juice; and (3) the so-called 'single strength,' being the natural and untreated juice of the orange. Oranges for fruit juice purposes are valued and sold by the extent of their sugar content. Valencia oranges are apparently particularly valued for their high sugar content, and perhaps for their time of arrival on the market (although this advantage, of course, partially disappears when juices are kept from one season to the next).
 
 
 57
 Oranges are grown primarily in three states-- California, Arizona and Florida. Oranges from both East and West Coasts compete in the national markets, both in fresh oranges and by-products. Due to the freight rates, California and Arizona oranges and juices are sold on a two-price structure-- cheaper in the East, where Florida is closer and the freight costs on Florida juice lower, and more expensive in the West, where transportation from Florida costs more. We conclude the relevant market area here involved was the California-Arizona area.
 
 
 58
 4. Competition and Prices in the Product Involved in the Relevant Market
 
 
 59
 During the year 1951, Sunkist controlled approximately seventy per cent of the total by-product Valencia orange market in the California-Arizona area, or 318,000 tons of by-product oranges.
 
 
 60
 The remaining thirty per cent of by-product Valencia oranges grown in California-Arizona came from scattered growers such as: (a) Independent Citrus Growers & Shippers Association, a grower cooperative (Morgan Ward, selling agent); (b) Mutual Orange Distributors of Anaheim, California, a grower cooperative; (c) American Fruit Growers Company, an independent grower, packer and shipper; (d) Paramount Citrus Association, a corporation organized by various growers for profit; (e) an unorganized group of individual growers, members of (a) above, who did not desire to market through Morgan Ward.
 
 
 61
 In 1951 in the California-Arizona area, there were three principal independent processors of by-product oranges: Winckler & Smith, TreeSweet and Silzle. These had no growers to supply them oranges, so they were required to buy their by-product oranges from the aforementioned five 'independent' groups of growers, or from Sunkist or its subsidiary EOP, or (as to a very small amount of fruit) from even 'more independent' growers than the five independents above mentioned. Mutual, American and Paramount, mentioned in (b), (c) and (d) above, had their own processing facilities, and by 1951 were processing all their own fruit, so had none to sell to independent processors.
 
 
 62
 'Independent Citrus Growers & Shippers Association' had no processing facilities of its own and no sales organization. It therefore sold to independent processors. Whether these independent processors would buy by-product oranges to process into single strength juice depended, obviously, on the price they might be forced to pay for the oranges, and the price they might get for the canned or bottled single strength juice. If the processors could see no chance to make a profit, then the growers' representatives were forced to make processing contracts with hired processors in order to realize anything on their by-product oranges, and to prevent a loss.
 
 
 63
 There is no question but that Sunkist was the'leader' on pricing within the industry. In 1951 Sunkist admittedly set a price of $40.00 per ton on oranges containing 120 pounds of 'soluble solids.' (This is a term descriptive of what is left from an orange when water is extracted. It includes sugars, citric acid, and other solids. The average Valencia orange contains 120 pounds of soluble solids per ton of oranges.)
 
 
 64
 In 1951, 'Independent Citrus Growers & Shippers Association' made a contract with Case-Swayne Co., Incorporated, an independent processor with no grower's supply, to process its by-product oranges into canned single strength juice, selling it under the Case-Swayne label, paying a net to Independent after deducting costs and a profit. Independent had twelve to fifteen per cent of the total supply of by-product oranges in the California-Arizona market, or at least 53,000 tons.
 
 
 65
 On August 6, 1951, Morgan Ward for Independent, signed a processing contract with Winckler by which Ward agreed to deliver sixty tons of by-product oranges per day up to three hundred and sixty tons per week during the two-months' canning season for the production of frozen concentrate, but this did not produce single strength juice for Winckler to sell. On August 17, 1951, he wrote to Morgan Ward (Exhibit AZ) in which he complained that he was not getting oranges for single strength juice. He charged monopoly against Morgan Ward, and requested the latter to put the matter up to the By-Products Committee of the Independent Citrus Growers & Shippers Association. This was done; the matter was left entirely to Morgan Ward's discretion. That company still refused to sell oranges to Winckler for single strength processing. Mr. Ward's explanation is of interest. He said:
 
 
 66
 'Well, in 1951 I knew that we would be faced with a lot of fruit, there being no home for it outside of Winckler-Smith, Case-Swayne, Paramount and a few other small plants, a few small plants otherwise. I knew that we were going to have, in order to get money for the fruit for the growers, we were going to have to enter into participating contracts in processing this fruit, not with one, but several of these. So I wanted to be fair to Mr. Winckler, I wanted to be fair to Mr. Swayne and Paramount, for that matter, so I knew that Case-Swayne had no facilities except straight canned juice, so the first contract we entered into was with Case-Swayne for single-strength juice, orange juice.
 
 
 67
 'Q. That was early in the season? A. Early in the year. That was the first reason I gave him that part of it.
 
 
 68
 'The second reason was that if I gave single strength to Wincker and single strength to Case-Swayne, we would have our oranges out in the market competing in canned juice form, competing against each other.
 
 
 69
 'Then in order to be fair again with Winckler, I gave him the concentrate deal. Even though he wanted some single strength, I did not give it to him for that reason.'
 
 
 70
 Winckler & Smith had been organized in 1946. The amounts of by-product oranges it had purchased primarily from Sunkist and thereafter from others up to and including 1950 had been as follows:
 
 
 71
 1946-- $1,000,000 worth
1947-- Substantially less
1948-- $200,000 worth
1949-- 3,500 tons from Sunkist
 10,500 tons from Morgan
 Ward
 4,300 tons from other sources
1950-- 1,300 tons from Sunkist
 11,500 tons from Morgan
 Ward
 4,100 tons from other sources
 
 
 72
 During this same time, the tons of by-product oranges it had purchased from other sources, including Morgan Ward, had been increasing. Thus it is not entirely accurate to state, as appellees do, that 'appellee (Winckler & Smith) had been a regular customer of Sunkist in the purchase of by-product oranges since its organization in 1946,' up to 1951.
 
 
 73
 In 1951 Sunkist started out the year with plans for pooling and disposing of all its by-product oranges. The plan was to have EOP process the fruit, or tl sell to other processors. A schedule of prices was established at which fruit was to be sold at a separate price per ton for each pound of soluble solids per ton, ranging from sixty to one hundred and fifty pounds.
 
 
 74
 The price set on by-product Valencia oranges for 1951 ranged from $17.00 per ton for fruit having sixty pounds of soluble solids to $51.50 per ton for fruit having one hundred and fifty pounds of soluble solids. Fruit having one hundred and twenty pounds of soluble solids was priced at $40.00 per ton, f.o.b. packing house. This price was set by Sam H. Kelly, general manager of Sunkist's Los Angeles District Office. The 'Independent Association' followed the 'lead' of Sunkist as to price.
 
 
 75
 Sunkist sold 46,000 tons of by-product oranges at this price to independent processors in 1951. Apparently these oranges went into hot or frozen concentrate, as there was testimony such a price could be paid for such oranges so used in 1951 and produce a profit.
 
 
 76
 All other tonnage of Sunkist growers in 1951 was turned over to EOP for disposal. This was the largest by-product Valencia orange crop ever handled by EOP. It received 318,000 tons, processed 164,000 tons, and turned over 31,200 tons to ELP for processing at cost.
 
 
 77
 Exchange Orange thus had 122,800 additional tons of by-product oranges on hand. It sold 19,747 tons to General Foods; 14,842 tons to Hyland-Stanford; 6,773 tons to Mission Dry; and 3,730 tons to Hart's for processing, or a total of 45,092 tons, under 'custom packing' contracts,[3] into hot and frozen orange concentrate, but not for single strength juice. It contracted with TreeSweet to process 24,148 tons into single strength juice, and Silzle to process 6,675 tons into single strength juice. These were the contracts described as two of 'six acts' which are the basis of appellees' complaint against Sunkist. Ten thousand six hundred and thirty tons were sold to Mission Dry and 817 tons to Hyland-Stanford under a 'deferred payment plan.'[4] This left 35,000 tons, approximately, which were unsuitable for processing into juice products.
 
 
 78
 The years immediately before 1951 had seen a change in the use of by-product oranges. In 1950 EOP processed eleven per cent of all frozen orange juice in the California-Arizona market. In 1951 it processed fifty-eight per cent. There was an increasing market for frozen orange juice. Nevertheless, it was advisable and necessary to maintain the market in canned single strength juice.
 
 
 79
 There were four principal independent processors of canned single strength orange juice in the California-Arizona area, namely, TreeSweet, Silzle, Case-Swayne and appellee. TreeSweet sold in the national market under its own label. Silzle sold in the national market to private label buyers. Case-Swayne sold largely in the California market under its own label 'Case-Swayne.' Appellee sold in the national market under its 'Anagold' label. These four canners were in competition with each other, and each of them competed with Sunkist, in the sale of canned single strength orange juice in interstate commerce.
 
 5. Contracts in the 1951 Season
 
 80
 Under the 1951 contract between Exchange Orange and TreeSweet, Exchange Orange made by-product oranges available to TreeSweet on a consignment basis in such quantities as Exchange Orange determined. Exchange Orange agreed to pay TreeSweet its processing costs at specified rates and to pay the trucking costs of the fruit to TreeSweet's plant. TreeSweet agreed to purchase the resultant juice at the Sunkist published selling price as of the date of purchase, less discounts and allowances of fifteen per cent plus an advertising allowance of seven cents per case. TreeSweet was not required to pay for the juice until it was sold. The oil and peel were to be the property of Exchange Orange.
 
 
 81
 Under this contract TreeSweet processed 24,148 tons of by-product oranges into canned single strength orange juice, and sold it in the same interstate markets under the TreeSweet label in competition with similar juice sold by Sunkist and Silzle.
 
 
 82
 Finley (general manager of Exchange Orange) admitted that the Exchange Orange-TreeSweet contract guaranteed TreeSweet against any inventory losses and protected it against any reductions in the market price for canned juice during both the selling and carry-over seasons, He admitted further that Tree-Sweet was guaranteed a profit under such contract. He stated that the TreeSweet contract provided, in effect, that Exchange Orange was to be paid for its by-product oranges on the basis of the difference between the amount credited to TreeSweet for processing such fruit and the price which TreeSweet paid Exchange Orange for the processed juice.
 
 
 83
 The amount credited to TreeSweet for processing the 24,148 tons was $859,004.00, and the amount payable by TreeSweet for the juice processed therefrom was $1,204,031.41. The difference between these two figures, to wit: $345,027.41, was the amount TreeSweet actually paid Exchange Orange for the 24,148 tons without the peel and oil by-products, or at the rate of almost $14.29 per ton.
 
 
 84
 Under this contract, EOP was to get the oil and peel or the proceeds therefrom. The net return from the oil and peel was $10.81 per ton. Therefore, the total amount EOP received for the by-product oranges processed under the TreeSweet contract was $25.10 per ton, namely, $14.29 actually paid by TreeSweet plus $10.81 for the oil and peel, or a price which was $19.12 less than the price for which the same quality of oranges were available for sale by Sunkist to other independent processors, including appellees.
 
 
 85
 Substantially the entire production of single strength orange juice under this contract was marketed under the TreeSweet label, and none of it was sold under the Sunkist label, TreeSweet received an advertising allowance of seven cents per case. The usual purpose of an advertising allowance was to advertise the brand name of the concern granting such allowance, but in this case TreeSweet was permitted to make any use it was permitted to make any use it
 
 
 86
 The contract with TreeSweet was justified on the ground that TreeSweet had the facilities to process the juice and the sales organization to move the merchandise, and on the ground that it was important that some California single strength juice be on the market in 1951. Sunkist had never mentioned to any independent processor until 1951 that this kind of arrangement was being made available to TreeSweet during the years 1947 to 1950, inclusive.
 
 
 87
 Silzle was engaged primarily in the business of processing and selling canned single strength orange juice. It sold such juice primarily to private label buyers who sold to the same class of customers and in direct competition with canned single strength juice sold by Sunkist, TreeSweet and appellees. Silzle had secured through the Bauer Fruit Company, a partnership composed of certain stockholders of Silzle, its fruit requirements.
 
 
 88
 Early in 1951, Kelly of Sunkist called Finley of EOP to secure the latter's approval to sell seventy-two tons of by-product oranges to Silzle at $27.00 per ton, including the oil and peel, in order to permit Silzle to meet a competitive situation then existing with Case-Swayne. Finley approved the sale. These oranges ranged from one hundred twenty-three to one hundred thirty-six pounds of soluble solids per ton which, under the Sunkist published selling price, were priced from $41.15 to $46.13 per ton. A little later, under an oral arrangement, Finley let Silzle have five hundred and twenty-seven tons at $22.50 per ton, with Silzle keeping the oil and peel.
 
 
 89
 About the middle of June 1951, Finley contacted Thelma Silzle, president of Silzle, and offered her a contract similar to the TreeSweet contract, 'and she was willing and wanted a contract.' The parties operated on an oral basis for most of the season. The written contract was not signed until September 10, 1951, but by its terms it was to be effective from July 15, 1951 until the end of the season.
 
 
 90
 Under this contract Silzle processed 6,675 tons of by-product oranges into canned single strength orange juice, in addition to the seventy-two tons and five hundred and twenty-seven tons purchased earlier. Silzle purchased the canned juice from EOP at the published Sunkist selling price at the time of purchase, less a discount of twelve and one-half per cent, plus and advertising allowance of seven cents per case. Silzle was credited with $215,602.10 for processing, and it paid EOP the difference between $215,602.10 and $306,263.65, Sunkist's selling price for the resultant juice. Silzle thus paid $90,661.55 for the 6,675 tons of oranges exclusive of oil and peel, or at the rate of $13.58 per ton for by-product oranges. The average soluble solids content of the oranges processed by Silzle under the 1951 contract was one hundred and twenty pounds of soluble solids per ton. The Sunkist published selling price in 1951 for by-product oranges containing one hundred and twenty pounds of soluble solids per ton was $40.00 per ton. Silzle thus acquired oranges from EOP, exclusive of the peel and oil content, at a price which was $26.42 per ton less than Sunkist's published selling price for oranges of the same quality.
 
 
 91
 Under this contract EOP was to get the value of the oil and peel, which amounted to $4.08 per ton, Thus, the total amount EOP received for the by-product oranges processed under the Silzle contract was $17,66 per ton, namely, $13.58 per ton paid by Silzle, plus $4.08 per ton received for the oil and peel; or a price which was $22.34 per ton less than the price for which the same quality of oranges was available for sale by Sunkist to other independent processors, including appellees. Unlike TreeSweet, Silzle was to pack juice only for current sales, not for inventory.
 
 
 92
 The terms of the various contracts are definite. The contracts themselves are in evidence, and their execution is admitted by the pleadings.
 
 
 93
 The question permitted to go to the jury for determination was why Sunkist, in 1951, sold to one processor of 'single strength Valencia orange juice' at one price, and failed to sell to another at any price. If there was a refusal, was it a valid exercise of business judgment? If so, it was lawful. If it was a contract made to restrain competition or to fix prices, or, from a position of legal monopoly, was used illegally to monopolize or to attempt to monopolize, then appellees were entitled to recover damages proximately resulting from appellants' illegal acts. Such questions obviously would ordinarily be questions of fact.
 
 6. The Alleged Refusal to Sell
 
 94
 We have observed above, with respect to the 'sixth act' of the 'six acts' mentioned hereinbefore (II(f), supra), that Sunkist denied any refusal to sell to appellees, but admitted no contract had been made with them.
 
 
 95
 The right to offer to sell or buy with perfect freedom, and to refuse to sell or buy with the same freedom, is supposedly a fundamental right sought to be protected by our competitive free enterprise system, and by the antitrust laws.
 
 
 96
 Its legality has been primarily established by what has been described as one of the ten leading cases in antitrust enforcement during its seventy year history: United States v. Colgate & Co. 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. Speaking for a unanimous Court, Mr. Justice McReynolds there referred to the long recognized right of a manufacturer to exercise his independent discretion as to parties with whom he would deal.[5] But like so many generalizations, the 'right' to exercise independent discretion cannot be taken as an absolute.[6]
 
 
 97
 Mr. Justice Burton so stated in Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 155, 72 S.Ct. 181, 96 L.Ed. 162.[7] As Mr. Justice Holmes said: 'But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion.'[8]
 
 
 98
 We speak here only of decisions arrived at unilaterally, i.e., the decisions of the single trader. Any notion that such a right to select customers by joint action exists has been laid to rest.[9] Klor's has reduced this prospect to a mirage.[10]
 
 
 99
 Confining our attention, then, to the decision made by a single trader irrespective of any statutory immunities, we ask whether the seller may select with whom he may deal. Whether we label it a right or a privilege, both common law[11] and statute[12] have consistently adhered to the general theory expressed in Colgate. Late Supreme Court cases confirm its existence,[13] but with certain definite limitations.
 
 
 100
 Text writers tell us this general 'right' of choice of dealing may be violative of antitrust laws when it is 'misused or abused,' i.e., 'when there is proof of any one of a number of plus elements of liability that may taint the otherwise lawful individual refusal to sell.'[14] 'These plus elements,' says Professor Oppenheim of Michigan,
 
 
 101
 'include, among others, the following major species of illegality: (1) tortious conduct constituting unfair competition or unfair trade practice at common law; (2) violation of a civil rights statute or other type of constitutionally valid statute limiting refusals to deal; and (3) conduct otherwise in violation of the Sherman Act, Clayton, Section 5 of the Federal Trade Commission Act or any applicable state antitrust statute.'[15]
 
 
 102
 But the decisions in past years,[16] as well as recent dicta by the Supreme Court,[17] warrant the generalization made by a writer with which this Court agrees: '(An) individual refusal to deal is preserved wherever it is reasonably ancillary to the effectuation of lawful marketing objectives.'[18]
 
 
 103
 Entirely apart from a unilateral refusal to sell or deal, we have, charged herein as a conspiracy, the joint or concerted refusal. 'Concerted refusals by traders to deal with other traders' are equated to 'group boycotts' by the most recent Supreme Court decision on the subject.[19] They 'have long been held to be in the forbidden category.'[20] The Court goes on:
 
 
 104
 'They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 466, 467-468 (61 S.Ct. 703, 85 L.Ed. 949). Cf. United States v. Trenton Potteries Co., 273 U.S. 392 (47 S.Ct. 377, 71 L.Ed. 700). Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 213 (71 S.Ct. 259, 95 L.Ed. 219), 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' Cf. United States v. Patten, 226 U.S. 525, 542 (33 S.Ct. 141, 57 L.Ed. 333)' Klor's, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, at page 212, 79 S.Ct. 705, at page 709.
 
 
 105
 Thus, in this case, we conclude the question as to whether there had been a concerted refusal to sell, as alleged by appellees, or an illegal unilateral refusal to sell, were questions of fact for refusal jury's determination. The jury's verdict court have been based on either (1) the alleged illegal conspiracy and agreement to make contracts constituting a restraint of trade, or (2) the alleged illegal sole trader decision not to sell, made with an intent to illegally restrain trade or commerce, and implemented by other illegal means beyond the bare refusal, or (3) a similar unilateral decision not to sell, except at a fixed price, made from a monopoly position, with an intent or purpose to eliminate a competitor. We cannot know which one or more of the theories stated were adopted by the jury in determining liability. With this in mind, we must consider the evidence and the instructions given on this phase of the case. If there exists in the record sufficient evidence to justify the action going to the jury on all three of these theories, and there were no errors in the instructions nor in the introduction of evidence, then we are bound by the jury's verdict on questions of fact.
 
 
 106
 We conclude that this was the theory under which the trial court permitted the case to go to the jury, as disclosed by the instructions themselves and the trial court's and counsel's comments, and discussion of them, at the trial. We further conclude such submission to the jury was, in theory, correct.
 
 
 107
 B. Was there error in instructing or refusing to instruct the jury?
 
 
 108
 This was not an easy case in which to instruct the jury, and the instructions were necessarily many and involved.
 
 
 109
 In the instructions, the jury was first advised that a parent corporation and its wholly owned subsidiary (Sunkist and Eop, respectively) 'can be guilty of combining or conspiring together to violate the antitrust laws,' i.e., on the theory of an intracorporate conspiracy (e.g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219); that acts lawful in themselves can become unlawful 'when part of an illegal scheme or plan, or when used to accomplish an illegal purpose' (e.g., Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674); that the acts charged against appellants under the first or restraint of trade cause of action need not have been shown to have been done with specific intent of elimination of competition in the juice market, if those acts 'actually and necessarily resulted in the elimination of such competition,' since everyone is presumed to intend the natural and probable results or consequences of his conduct. People v. Renoso, 1952, 109 Cal.App.2d 793, 241 P.2d 628; King v. Commonwealth, 1941, 285 Ky. 654, 148 S.W.2d 1044.
 
 
 110
 The court then referred to the 'six acts' complained of which were claimed to be the proximate cause of appellees' damage (see II(a) to (f), supra), and added:
 
 
 111
 'The other contracts entered into evidence between Exchange Orange and Hyland Stanford, Harts, Case-Swayne, Mission Dry and General Foods, also referred to as Bireley's, were offered and received for the general purpose of showing the operations of Exchange Orange and such bearing as they may have in general, but are not claimed or alleged by the plaintiffs, to be any cause of their claimed damage.'
 
 
 112
 The court explained the defendants' defenses.[21]
 
 
 113
 The court then instructed on monopoly power:
 
 
 114
 'The use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage or to destroy a competitor is unlawful.
 
 
 115
 'The defendant Sunkist is permitted under the law to acquire a legal monopoly over product Valencia oranges that are available for processing into citrus juice products, including single-strength Valencia juice. Sunkist or Exchange Orange could in 1951 have legally processed all of such oranges in their own plants into citrus juice products and not made any of them available to independent processors, such as the plaintiff, TreeSweet or Silzle, if they had been able to, and cared to do so. Defendant Exchange Orange, as the processing company for the grower members of Sunkist, could also enter into lawful processing contracts with independent processors to have the oranges of the grower members of Sunkist processed into citrus juices to be thereafter sold by Sunkist as the citrus juice products of its grower members to prospective buyers thereof, including independent processors. However, such contracts must be lawful processing contracts and not devices which are resorted to pursuant to the conspiracy charged to illegally restrain trade, or to illegally monopolize that part of the citrus juice market which is represented by such citrus juices as are processed in California and thereafter sold in interstate commerce. It is for you to decide whether the contracts which Exchange Orange entered into in 1951 with TreeSweet and Silzle, when coupled with any refusal of the defendant Sunkist or Exchange Orange, to make oranges available to the plaintiff under comparable arrangements pursuant to the combination or conspiracy charged, were lawful processing contracts, or whether they were contracts which were made pursuant to the combination or conspiracy charged and had the purpose and effect of restraining and/or monopolizing interstate trade and commerce in the citrus juices and particularly single-strength Valencia orange juice processed in California and sold in interstate commerce, by eliminating competition between Sunkist and such processors in the interstate market for such products as were processed under such contracts.'
 
 
 116
 And the court reinstructed on the same subject.[22]
 
 
 117
 The court next instructed on the power to determine prices, or to exclude a competitor, and the lawful as well as the unlawful exercise of that power, and referred specifically to the processing contracts with TreeSweet and Silzle.[23]
 
 
 118
 After advising the jury that direct evidence of a refusal to deal with Winckler on terms comparable to those offered to TreeSweet and Silzle was not necessary, and that EOP had a legal right to refuse to contract with Winckler unless such refusal was some part of a violation of antitrust laws, the court gave two instructions which he characterized as summing up 'what is charged and what the plaintiff must prove.' It is these instructions, originally requested by defendants but modified by the court, which appellants vigorously attack as error. They read:
 
 
 119
 '(a) Defendants' No. 7
 
 
 120
 'The first cause of action charges that the defendants Sunkist and Exchange Orange and the alleged co-conspirators, Exchange Lemon, TreeSweet and Silzle, combined and conspired with each other at a date unknown to the plaintiff, and entered into contracts and did certain other things in 1951 with the purpose and effect of unreasonably restraining interstate trade and commerce in canned citrus fruit juices, particularly single-strength Valencia orange juice produced in California and marketed throughout the United States, with the resultant injury and damage to the plaintiff, i.e., that Sunkist and Exchange Orange and the alleged co-conspirators Combined and conspired to eliminate the competition of the plaintiff in the interstate market for canned citrus fruit juices and particularly single-strength Valencia orange juice in the year 1951, and performed certain acts pursuant to such combination and conspiracy which proximately caused damage to plaintiff.
 
 
 121
 'Unless you find, therefore, from the preponderance of the evidence that Sunkist or Exchange Orange or either of them, combined or conspired with either TreeSweet, or Silzle, or ELP, and in 1951 did one or more of the specific acts charged-- those are the six acts, one or more of the six acts-- charged in the first cause of action, and that such act or acts had the purpose or necessary effect of damaging or eliminating the competition of plaintiff in the interstate market for California canned citrus fruit juices or single-strength Valencia orange juice, your verdict must be for the defendants on the first cause of action. * * *
 
 
 122
 '(b) Defendants' No. 17A
 
 
 123
 'The second cause of action charges that the defendants Sunkist and Exchange Orange and the alleged co-conspirators Exchange Lemon, TreeSweet and Silzle combined and conspired together, and performed the same six acts alleged in the first cause of action, which are incorporated by reference into the second cause, in order to monopolize the production and interstate sale of California citrus fruit juices, especially single-strength Valencia orange juice, and that pursuant to such conspiracy that actually monopolized such production and interstate sale of California citrus fruit juices, and particularly single-strength Valencia orange juice, with resultant injury and damage to plaintiff. Unless you find from the preponderance of the evidence that defendants Sunkist and Exchange Orange, or either of them, and one or more of the alleged co-conspirators, combined and conspired, and pursuant to such combination or conspiracy did one or more of the acts charged, and complained of, in order to acquire effective control of the interstate market for California citrus fruit juices, with the purpose or necessary effect of eliminating competition, including that of the plaintiff, from such market, your verdict must be for the defendants on the second cause of action.'
 
 
 124
 Under the charge appellants urge the jury could have found that the conspiracy consisted of only Sunkist or EOP and ELP. Such a conspiracy, say appellants, involved only exempt cooperatives; that these instructions removed any exemption created by Capper-Volstead from the case entirely.
 
 
 125
 This error, say appellants, was compounded by the trial court in its attempt to clarify the charge after it had been given. In this regard the court said:'I also am told that I spoke about how the defendants had conspired on one occasion. The charge is not that the defendants conspired. The charge is that the defendants and co-conspirators conspired.
 
 
 126
 'However, as a matter of fact, you may find that nobody conspired, or you may pick out and decide that some number less than the total conspired. It is your task to decide the facts.'
 
 
 127
 Appellants' argument first presupposes that agricultural cooperatives can combine to fix prices or eliminate competitors with immunity, otherwise Capper-Volstead means nothing. With this position we do not agree.
 
 
 128
 First: We do not now understand (since the Milk Producers decision) that different agricultural cooperatives, combining together, are entitled to claim, a total immunity for acts which they may lawfully do unilaterally, any more than individuals may claim for certain of their joint actions the same immunity under antitrust laws which would exist as to their several independent acts.
 
 
 129
 '(A) group of farmers acting together as a simple entity in an association cannot be restrained 'from lawfully carrying out the legitimate objects thereof,' but the section (Section 6 of the Clayton Act) cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will.' Maryland and Virginia Milk Producers Ass'n v. United States, supra, 362 U.S. at pages 465-466, 80 S.Ct. at page 853.
 
 
 130
 'The Capper-Volstead Act * * * extended 6 of the Clayton Act exemption * * * (but) did not leave cooperatives free to engage in practices against other persons in order to monopolize trade, or restrain or suppress competition with the cooperative.' Id., 362 U.S. at pages 466-467, 80 S.Ct. at page 853.
 
 
 131
 Second: We point out that the error as allegedly compounded by the loose language ('You may find that nobody conspired, or * * * that some number less than the total conspired.') was followed by a grudging approval of such instruction to the jury by both sides, just before the jury retired:
 
 
 132
 '(The Court:) * * * Now, do you want to come back up again, or are you content? Is that satisfactory?
 
 
 133
 'Mr. Fisher: I think we are content.
 
 
 134
 'The Court: Satisfactory, Mr. Dixon?
 
 
 135
 'Mr. Dixon: Satisfactory.'
 
 
 136
 Third: We think there exists support in the law for such instructions. United States v. Timken Roller Bearing Co., D.C.N.D.Ohio 1949,83 F.Supp. 248, affirmed 1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199. 'Common ownership and control does not liberate corporations from the impact of the antitrust laws.' Kiefer-Stewart Co. v. Joseph Seagram & Sons,supra, 340 U.S. at page 215, 71 S.Ct. at page 261. But cf: Report of the Attorney General's National Committee to Study the Antitrust Laws, pp. 30-36 (1955).
 
 
 137
 The entire instructions given cover fifty pages of the transcript. The first ten pages and the last five were 'stock instructions,' applicable in any private conspiracy antitrust case where plaintiffs seek damages. Ten pages of instructions cover the pleadings, the statutes involved, the appellants' denials and defenses, and an explanation of certain evidence received, to which no objection is made by appellants.
 
 
 138
 Appellants do however, in thirty-nine specifications object to almost every one of the remaining instructions, given at the request of appellees or on the court's own motion; and to four instructions which were requested by appellants but modified by the court. Additionally, twenty-seven instructions proposed by appellants and rejected by the court, are alleged as error. Thus, there are sixty-six alleged errors in the giving or refusing of instructions. We find it unnecessary to go into each instruction individually. Some are based on the theory of exemption which Maryland and Virginia Milk Producers Ass'n v. United States, supra, laid at rest,[24] or the 'public injury' concept, buried by Klor's, Inc. v. Broadway-Hale Stores, supra.[25] Some have to do with definition of the relevant market hereinbefore discussed.[26] Some have to do with intra-corporate conspiracy.[27] Others were allegedly vague, ambiguous, or confusing,[28] or tended to 'over-emphasize,'[29] or be unnecessary or needless repetition,[30] or were immaterial,[31] or focused attention unnecessarily.[32] All the foregoing objections not hereinafter touched upon we hold invalid, or of such slight consequence that they do not constitute substantial error, and are not prejudicial. Fed.R.Civ.P. 61, 28 U.S.C.A.
 
 
 139
 Appellees, of course, urge that the instructions must be 'viewed in their entirety, rather than in isolated segments'; that 'even if a single instruction is erroneous, it does not call for reversal if it is cured by a subsequent charge or by a consideration of the entire charge,' citing Jesonis v. Oliver J. Olson & Co., 9 Cir., 1956, 238 F.2d 307, 309. We agree with that general principle, yet if a substantial and prejudicial error is made in the giving of but one instruction, the verdict cannot stand. We therefore consider in more detail certain other alleged errors which we feel merit discussion. We refer to the following:
 
 
 140
 (1) Was it error to instruct the jury as follows (alleged error 2(c)):
 
 
 141
 'The use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.'
 
 
 142
 The objection was because (a) it assumes monopoly power existed when its existence was a question of fact for the jury; (b) it is inapplicable to a conspiracy situation; (c) the only charge of misuse of monopoly power is by conspiracy; (d) it contains no reference to substantial restraint on interstate commerce; (e) it is silent on matter of intent.
 
 
 143
 This instruction is an exact quotation from United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236. It is difficult for this Court to see how a monopolist can make any business decision without its involving and using its monopoly power, nor how it can make any sale or purchase (for example) at an advantageous price, without gaining some competitive advantage. The statement is a broad one, but there were several other instructions given which modified and tempered its broadness, and which we must assume the jury understood and followed.
 
 
 144
 We find no merit to the objections urged, in view of the instruction taken as a whole and read together, as we are required to do on this appeal.
 
 
 145
 (2) Was it error to instruct the jury as follows (alleged error 2(r)):
 
 
 146
 'Single strength orange juice * * * sold in interstate commerce may be the subject of restraint and monopoly under the Sherman Act.'
 
 
 147
 The objection was because (a) this is a question of fact for the jury; (b) which was taken away from the jury.
 
 
 148
 The question of whether substantial interstate commerce exists is a question of fact for the jury. Marks Food Corp. v. Barbara Ann Baking Co., decided December 28, 1959, as amended 9 Cir., 274 F.2d 934. Cf. Beacon Theatres, Inc. v. Westover, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988. But such question as to whether single strength orange juice was or was not a subject of restraint or monopoly was not, in our opinion taken away from the jury when the instructions are again read as a whole. Even considered singly, the instruction stated the jury might, not that it must, find that single strength orange juice was the subject of restraint and monopoly in interstate commerce. We hold there was no prejudicial error in this instruction.
 
 
 149
 (3) Was it error for the court to comment to the jury on the legal effect of Exhibits 84-A (plaintiff's re-organization plan, alleged error 2(aa)) and particularly the last paragraph of said comment:
 
 
 150
 'The loss of $169,000 or $170,000 resulting from the sale of the real estate and plant referred to in the evidence should not have been taken into account during Winckler & Smith's fiscal year ending January 31, 1950, and Mr. Lynch, the expert witness for the defendants, should not have so considered it, and the court was in error in permitting him to do so in his computations.'
 
 
 151
 The objection was because (a) when the loss was to be taken was not a matter of law; (b) the comment discredited appellants' expert witness, Lynch.
 
 
 152
 In view of our position hereinafter taken as to damages, error or lack of it in this instruction is immaterial.
 
 
 153
 ( 4) Was it error to refuse appellants' six instructions, nine to fourteen, inclusive, instructing the jury the 'six acts' complained of were not unlawful (alleged error 3(b))?[33]
 
 
 154
 Each of these instructions referred to one of the six acts as being 'nothing unlawful.' They then went on to say that unless the acts were 'part of a conspiracy' made with the purpose and effect 'of eliminating competitors, you will disregard such agreement or arrangement as being of no consequence in the case.' Thus, in effect, the act 'X' was lawful, unless you find it was done in unlawful conspiracy. These instructions were confusing. In view of all instructions given, and the nature of the case, we cannot hold the failure to give them, just as requested by defendants and appellants, constituted prejudicial error.
 
 
 155
 (5) Was it error to give the court's own instruction E (alleged error 2 (y))[34] because of the court's ruling excluding so called 'after-acquired' information with respect to appellees' alleged watering of juice?
 
 
 156
 This again can better be decided under a discussion of errors charged with respect to the introduction of evidence.
 
 
 157
 (6) Was it error to fail to instruct the jury as to necessity of 'specific intent' to eliminate a competitor in the first cause of action, and to exclude appellee as a competitor in the second cause of action (alleged errors 3(m), 3(n))? Appellants rely on United States v. Griffith, supra, and Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, in support of both of their proposed instructions (nos. 8, 18).
 
 
 158
 'It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements. * * * Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act. The classical statement is that of Mr. Justice Holmes speaking for the Court in Swift & Co. v. United States, 196 U.S. 375, 396 (25 S.Ct. 276, 279, 49 L.Ed. 518):
 
 
 159
 "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent-- for instance, the monopoly-- but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. Commonwealth v. Peaslee, 177 Massachusetts, 267, 272 (59 N.E. 55). But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous, probability as well as against the completed result.' 'Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of (Sherman Act) 2, provided it is coupled with the purpose or intent to exercise that power.' United States v. Griffith, supra, 334 U.S. at pages 105-107, 68 S.Ct. at page 944.
 
 
 160
 Thus we find it not necessary to find a specific intent to restrain trade or eliminate a competitor or to create a monopoly. It is necessary to find that the restraint of trade or monopoly results as a consequence of the critical act, and that such act was done with the specific intent of accomplishing that act, when the actor acts from such a position that the natural result or necessary effect accomplishes the proscribed act. The actual result need not be the object to the specific intent.
 
 
 161
 We therefore rule that there was no error in refusing the appellants' proposed instructions 8 and 18 (alleged errors 3(m) and 3(n)). Cf. Times-Picayune Pub. Co. v. United States, supra, 345 U.S. at page 614, 73 S.Ct. at page 883, where the Court said:
 
 
 162
 'The * * * contracts must be tested under the Sherman Act's general prohibition on unreasonable restraints of trade. For purposes of 1, '(a) restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint, or because it falls within the class of restraints that are illegal per se.' United States v. Columbia Steel Co., 334 U.S. 495, 522 (68 S.Ct. 1107, 1121, 92 L.Ed. 1533) (1948).
 
 
 163
 'It 'is unreasonable per se to foreclose competitors from any substantial market." Id., 345 U.S. at page 608, 73 S.Ct. at page 880.
 
 
 164
 Mr. Justice Clarke in Times-Picayune then goes on:
 
 
 165
 'since the requisite intent is inferred whenever unlawful effects are found, United States v. Griffith, 334 U.S. 100, 105, 108 (68 S.Ct. 941, 944, 946, 92 L.Ed. 1236) (1948); United States v. Patten, 226 U.S. 525, 543 (33 S.Ct. 141, 145, 57 L.Ed. 333) (1913), and the (tying cases) rule of International Salt is out of the way, the contracts may yet be banned by 1 if unreasonable restraint was either their object or effect.' Id., 345 U.S. at page 614, 73 S.Ct. at page 883.
 
 
 166
 In conclusion, we find no reversible error in the instructions, other than error that need not be considered in view of our ruling as to damages, hereinafter to be discussed.
 
 
 167
 C. Was there error in rulings on admission and rejection of evidence?
 
 1. As to Liability
 
 168
 Appellants urge that much evidence offered by them was wrongfully excluded by the trial court. They charge that this evidence went not only to the measure of damages, but to causation and liability. Motions for a directed verdict and for judgment non obstante verdicto were made, not only upon the grounds that plaintiffs had failed to prove (a) any conduct outside the agricultural cooperatives' exemptions; (b) any combination or conspiracy to restrain trade, or (c) any monopoly control or capacity or intent, but also upon the grounds (d) that plaintiffs had failed to prove injuries proximately resulting from any act of defendants, or (e) the amount of any damages claimed to have resulted to plaintiffs.
 
 
 169
 When Winckler asked in his second conversation with Finley for a contract similar to the TreeSweet and Silzle contracts, he was told he could not have the same type of contract. 'I told him I * * * was having plenty of trouble * * * with those we did have contracts with wanting more fruit, rather than less fruit, so I just couldn't give him a contract and cut off our old customers.'
 
 
 170
 Appellants sought to introduce evidence 'heard from others in the industry' that Winckler & Smith's juice was regularly watered and adulterated, and was of poor and inferior quality, and that such facts were in defendants' corporate 'mind' when it refused to deal with Winckler & Smith in 1951, and this excused its 'refusal' to so deal. This, of course, was, if admissible, material not only on the issue of liability, but also on the nature and extent of damages that proximately resulted from any liability found.
 
 
 171
 The difficulty with appellants' position with respect to admissibility on the question of liability was that specific information as to such 'watering' had not reached the appellants at the time of their 'refusal' in 1951. They had suspected that such facts existed; there had been rumors thereof, but no substantiation amounting to proof. We take it if a person charged with making a decision (which may or may not be a violation of law, dependent upon the intent and purpose and effect which accompanies it) is willing to rest such decision on surmise, suspicion, conjecture, and intuition, he has that right, but so acts at his peril. He may be called upon to justify it. Subsequently discovered facts cannot be introduced to fortify the strength of the facts upon which such previous surmise, conjecture and suspicion was based, but subsequently discovered facts could be utilized as a defense to the amount of damages claimed to have proximately flowed as a result of defendants' actions, whether such facts were known or unknown at the time the decision was made.
 
 
 172
 Appellants offered to prove 'a statement by a former sales manager of Winckler & Smith Company, who, when asked whether Winckler was watering his product, this fellow said, 'I don't know, because I was instructed never to go into the plant." If we assume that this alleged statement goes beyond the expressed lack of factual knowledge it discloses on its face, and if it does purport to express a fact, it was not offered to establish the truth of the facts it purportedly contained, but the condition or state of Finley's mind when he talked to Winckler.
 
 
 173
 Appellants' offer of proof went farther than to show a condition of mind. It was that Finley would testify that Charles Sisk, when asked if Winckler & Smith watered their products, said to Finley:
 
 
 174
 'I couldn't prove it in court, but I am sure they do. Winckler, though, ordered me strictly never to go out in the plant, and I was never allowed in the plant while I was sales manager.'
 
 
 175
 Again this expressed an unprovable opinion[35] in a third person that watering of the orange juice took place. But it was offered, not to prove watering, but that such a statement had been made to Finley-- a statement that might affect his state of mind. In refusing the offer, the court ruled not that it was inadmissible to prove the state of mind, but was inadmissible as hearsay. The court stated:
 
 
 176
 'Objection sustained as to conversation with Charles Sisk, the former sales manager. If you want to bring Sisk in, we will cross that bridge at that time, as to what he can testify to.'
 
 
 177
 Part of the offer made was to show that at the price Winckler & Smith sold certain Arizona grapefruit juice, it could not make a profit. From this Finley concluded that water and sugar must have been added. As the trial court pointed out, another conclusion of equal validity would be that the sales were made by Winckler & Smith at a price which lost it money. Many factors, such as amount of stock on hand, finances of the company selling, or a dozen other factors might have brought about a sale at a losing price-- and none of such reasons would be the basis for a conclusion that the juice was watered.
 
 
 178
 The trial judge concluded that the offer did 'nothing but add and inject into the case other issues,' and sustained the objection. Additionally, the offer was refused because the same witness, Finley, had testified the reason for his refusal to sell to Winckler was that he was having trouble with his existing contracts, because of a shortage of fruit. Or, as the trial court stated it, 'because of the capacity that was involved.' Of course, if Finley had more than one reason for refusing to deal with Winckler, he had the right to detail it, or them, to the jury. That he rested on but one explanation under cross-examination by plaintiff-appellee is no reason he could not have enlarged his reasons on direct examination. This presents a serious question as to whether error was not committed by the trial court. However, the court gave a further reason why he would not admit such evidence. The court ruled as follows:
 
 
 179
 'I have already sustained the objection to similar matters on the further ground it is an issue that was never called to the attention of the court, was not listed as an issue that you intended to produce at this trial, was raised for the first time during the trial, and my previous comments on objections will be incorporated here at this point.'
 
 
 180
 An examination of the pre-trial proceedings contained in the transcript before us indicates the court's statement as to issues raised was correct. We are inclined to think the ruling made was within his general judicial discretion as to the method of trial of the case, at least on the issue of liability, particularly in view of what the court did permit counsel for appellants to introduce into evidence.
 
 
 181
 Counsel for appellants presented evidence mentioned in his offer of proof which had not been ruled out by the trial judge. Finley, to show his state of mind in 1951, testified (a) to his unsatisfactory experience with Winckler in 1947 when Finley had helped Winckler with scarce cartons, only to have Winckler's promises unfulfilled, with a subsequent recovery to Sunkist of eleven cents on the dollar; (b) to his unsatisfactory experience with Winckler & Smith in 1947 on the purchase of hot concentrates-- 'high yeast and bacteria count-- poor pasteurization'; (c) his dissatisfaction with the Citromats (orange squeezing machines) used by Winckler & Smith prior to 1951. The following question was then asked of Mr. Finley, still on direct examination and he gave the following answer:
 
 
 182
 'Q. Mr. Finley, at any time in 1951, assuming that you had had a surplus of fruit available for processing, would you have been willing to enter into any kind of a processing agreement with the Winckler-Smith Company? A. I would never have entered into a processing agreement with the Winckler-Smith Company.'
 
 
 183
 No additional offer of proof, nor any attempt to introduce evidence was made by appellants. We can find no ruling of the trial court on the issue of liability that constitutes error so prejudicial as to constitute reversible error.
 
 2. As to Damages
 
 184
 This brings us to the matter of Exhibits I-1 to I-4, identified by witness Opal Smith (a laboratory technician employed by Winckler & Smith, as Opal Comstock, in 1949 until 1952, inclusive) as 'Daily Laboratory Statistics' maintained by Winckler & Smith at their Anaheim plant, delivered to Mr. Winckler's desk.
 
 
 185
 As an example of her testimony, this witness testified that on one day the acid test in the raw juice was 1.54%; while in the canned product it was 1.27% Acid. This change in acidity, said the witness, was accomplished by the addition of water.
 
 
 186
 Appellees took the position that the information disclosed by these records was not known to Sunkist when Its Mr. Finley refused to contract with Winckler; that the fact of adulteration thus could not have entered into the refusal to contract, and was therefore immaterial. This position was taken by appellees, despite the testimony of the surmise or conjecture or conclusion of Sunkist's officer that the Winckler product was watered. If this evidence were offered solely for the purpose of explaining Sunkist's refusal, or adding a second reason for the refusal, it is conceivable that the records offered, at the then state of the record, would not be material, i.e., were what counsel for appellees described as 'after the fact evidence,' a phrase adopted by the trial judge. For that reason, we are not prepared to rule that the exclusion was error, if the limited purpose of offering the evidence was to show Finley's state of mind.
 
 
 187
 But such evidence was offered additionally for two separate purposes-- to impeach the plaintiff Winckler as to his knowledge as to whether or not his products were adulterated (as well as prove the fact of adulteration), and secondly, it was offered on the question of damages-- to show the Winckler & Smith product was inferior and not a 'Grade A' product, as Winckler had testified.
 
 
 188
 And, of course, if admissible for any purpose, the documents should have been admitted, Petroleum Carrier Corp. v. Snyder, 5 Cir., 1947, 161 F.2d 323; Estate of Clark, 1949, 93 Cal.App.2d 110, 116, 208 P.2d 737, with necessary precautionary instructions requested and given to the jury.
 
 
 189
 The trial judge originally saw the admissibility of such evidence on the issue of damages. But he saw difficulties in any effort which defendants-appellants might make to show (a) complaints by dissatisfied users that the product was watered; (b) loss of sales due to adulteration.
 
 
 190
 Counsel for appellants stoutly maintained he could produce such testimony, and stated: 'getting back to the causation question * * * whether his product was good or bad has a bearing on why he went out of business.'
 
 
 191
 Counsel for appellants urged that in view of Mr. Winckler's previous testimony that 'Fancy' and 'Fancy California' were the equivalent of Department of Agriculture 'Grade A Fancy,' this evidence was admissible, for Mr. Winckler had testified that under the government definitions of orange juice, a citrus product that is sold as orange juice contains no ingredient other than the juice extracted from fresh fruit; and that sweetened orange juice contains no ingredient other than the juice with dry sugar added.
 
 
 192
 Counsel for appellants further offered to prove that Winckler & Smith added tap water to the juice, rather than 'merely' condensate. Winckler had denied he had done this, and agreed that 'introducing tap water' was not permissible.
 
 
 193
 Counsel for appellants further offered to prove that the records offered 'were regularly shown to Mr. Winckler, they bear his initials showing he has seen them. By one witness I will show they discussed this practice of adding water to these products.'The trial judge then discussed the admissibility of these records at some length. He commented on the lack of reference to the exhibits at the pre-trial; the 'obvious purpose of this evidence is to bootleg into the record after-knowledge which the defendants did not have'; the possibility of using the records for impeachment, and if so, what his duty would be in that regard;[36] and further stated:
 
 
 194
 'This matter of taking an exhibit that might be admissible for one small purpose and tossing it in a case where it can have the effect of being used for a different purpose presents a problem. It presents a problem to the Court in its right to control the admissibility of evidence in a case.
 
 
 195
 'An offer that you made injects issues in this case where this case could go on forever.'
 
 
 196
 The court then sustained the appellees' objections. On its admissibility on the question of damages, very little was said.[37]
 
 
 197
 We think the evidence was clearly admissible on the issue of damages, particularly in view of the specific terms of the offer with respect to causation, and specifically, dissatisfied users with resultant loss of sales. Such evidence was material, and we must assume the appellants were able to produce it, had they been allowed to do so. We find the exclusion of such evidence was error. While it remains a close question as to whether this error is not prejudicial to the issue of liability, we believe that its exclusion might come within the trial court's discretion as to the control of evidence as to collateral issues. We therefore do not hold it was prejudicial error on the issue of liability. On the other hand, we find it clearly was prejudicial on the issue of damages.
 
 
 198
 The same conclusion applies to the proffer of proof by appellants of testimony by the witness William Rodgers, former plant superintendent of Winckler & Smith, that that witness had observed that single strength orange juice had been stretched by the addition of water and other additives to the extent of approximately twenty per cent-- and that Mr. Winckler knew of this addition, and was satisfied to let it continue.
 
 
 199
 Appellants likewise claim error in restrictions placed upon them by the court's rulings preventing them from exploring Winckler & Smith's earlier business history-- prior to 1951-- or its alleged under-capitalization and inefficient operations; the court's position that losses reported for income tax purposes did not necessarily mean actual business losses; the court's refusal to admit Winckler's letters in 1951 explaining his inability to deliver juice due to other reasons, and the court's rulings respecting witness Hodge's mythical 12,000 tons theory of loss, and the appellants' attack thereon.
 
 
 200
 Appellants point out, as most important rulings against them, the following:
 
 
 201
 (1) Appellants sought to show that after the Chapter X reorganization, Mr. Winckler and other stockholders had withdrawn some $250,000 from the company in a two and one-half year period by way of salary, bonuses, debt forgiveness, and rentals. Appellees' objection was that this line of proof was 'wholly irrelevant and immaterial * * * and not tending to prove or disprove any of the issues of this lawsuit.' The objection was sustained, with the comment that appellants could prove the condition of the company in 1951. Later, the trial court relaxed this ruling somewhat what to permit interrogation as to salary, allowances and bonuses paid Mr. Winckler in 1949, 1950 and 1951, but not in other years; and he still excluded Exhibit BI which summarized the figures in the three years mentioned.
 
 
 202
 (2) While admitting evidence of the ultimate fact that Mr. Winckler had been forgiven a $38,000.00 indebtedness owing the corporation, the court excluded any breakdown of that figure. It was sought to show by this breakdown that substantial amounts of corporate funds were expended to enable Winckler to buy out one of the company's stockholders; and that the corporation, through its Chapter X receiver objected to the former's claim in this regard. The objection to this evidence was not clearly expressed, but seems to have been irrelevancy and 'that the representation could not be supported by this witness (Mr. Lynch, appellants' accountant).' The objection, whatever it might have been, was sustained.
 
 
 203
 (3) Appellants were not permitted to show that in 1949 and 1950-- the two years claimed by plaintiff to have been profitable ones-- Winckler & Smith filed income tax returns showing a net loss, rather than a profit, in each of those years. The objection to this testimony stated no grounds-- it was merely 'I object to any inquiry along that line.' That 'objection' was sustained. Later appellees' counsel spoke of it being out of order, in the middle of the trial, to require plaintiff to produce further records, i.e., the tax return for 1949; and the 'objection' was against sustained on the ground the request came too late, and it would be going into extraneous issues. However, copies of state or federal returns for 1949, 1950 and 1951, with supporting schedules, had long since been identified by Mr. Winckler. And when those copies were offered in evidence they were excluded, the objection then being irrelevancy. Furthermore, when the court's attention was called to the fact that the 1949 return had been requested in appellants' pre-trial discovery long before the trial, he declined to change his ruling.
 
 
 204
 (4) It was appellants' theory that in calculating the loss or gain from the mythical 12,000 tons, as well as to arrive at the true cost of fruit under a TreeSweet type arrangement, it was necessary to take into consideration the returns from oil and peel which, under such an arrangement, would have belonged to EOP. Accordingly, they prepared computations which took that factor into account and which showed that the cost of the fruit would be considerably more than Mr. Hodge's calculated figure and that the result vis-a-vis processing of the 12,000 tons, would have been an additional loss. They also sought to have their accountant witness testify that this factor was omitted in Hodge's computations. The effort proved fruitless. The trial judge, largely on his own motion and for the reason that he thought appellants' theory to be illogical excluded the proffered evidence, both oral and documentary, on this subject. At first the trial judge indicated that he would exclude it only as direct rebuttal of or comparison with Plaintiffs' Exhibit 69-A in which the results of Hodge's theory were incorporated. Ultimately, however, he excluded the evidence entirely.
 
 
 205
 (5) A number of letters issued by Winckler & Smith were offered as containing statements, i.e., admissions, showing that in 1951 its inability to furnish orange juice was due to the short California supply of fruit, heavy local bookings by Winckler & Smith, or excessive Florida inventory which had driven prices down. No objection was made as to foundation or authenticity; but it was objected that the person signing the letters had testified earlier. The objection was sustained.
 
 
 206
 Without going into precise details as to which portions of this evidence to which objections were sustained should have been admitted, we can say that we believe appellants were denied a fair opportunity to present their defense on the issue of damages to the jury. For example, income tax returns are frequently admissible, even though capable of being explained away, Roche v. Commissioner, 5 Cir., 1933, 63 F.2d 623; United States v. Farrell, D.C.D.Conn.1929, 35 F.2d 38, and the business experience and operations and profits of previous years are not always, or necessarily, inadmissible.
 
 
 207
 The obligation is on a plaintiff in a Sherman Act case to prove damages recoverable in an action at law. Locker v. America Tobacco Co., 2 Cir., 1914, 218 F. 447.
 
 
 208
 It cannot be said that the erroneous exclusion of evidence directly bearing on damages would not have affected the verdict. The error is therefore presumed to be prejudicial. 'An erroneous ruling which relates to the substantial rights of the party is ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial.' McCandless v. United States, 1936, 298 U.S. 342, 347-348, 56 S.Ct. 764, 766, 80 L.Ed. 1205.
 
 
 209
 While a great deal of leeway is granted a jury in assessing damage once the fact of injury has been established, the damages alleged must be established as a direct and proximate result of defendant's violation of the Sherman Act with reasonable certainty. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544; Flintkote Co. v. Lysfjord, 9 Cir., 1957, 246 F.2d 368; Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427, 431.
 
 
 210
 Plaintiffs-appellees introduced by means of the expert testimony of Mr. Hodge evidence of alleged loss of profits. This loss was based upon several presumptions:
 
 
 211
 First: That 12,000 tons of Valencia oranges were available to appellees;
 
 
 212
 Second: That the amount of juice taken therefrom would have produced a certain amount of canned juice, which would have been sold at a certain price, i.e., the same price Sunkist charged TreeSweet before discount and allowances;
 
 
 213
 Third: That processing and other costs to Winckler in 1951 would be the same in 1951 as they were in 1949.
 
 
 214
 The evidence was that Winckler & Smith usually had received less for its orange juice than the price Sunkist usually received. There was evidence the equipment used by Winckler & Smith was not as efficient and modern as that of other canners. The demand for its juices was surely not as heavy as the demand for Sunkist brands or TreeSweet juice. The number of its single strength juice customers was known to have declined substantially in 1950 over 1949.
 
 
 215
 But beyond all the foregoing, if such difficulties as to proof of damages were overlooked, a further assumption would be required, that the lack of dealing by Sunkist with Winckler & Smith was a proximate cause of the loss of Winckler & Smith's plant and business.
 
 
 216
 We need not go so far as to class this case with Wolfe v. National Lead Co., supra, where there was no proof of damage, and therefore dismiss the case. There this Court noted that the plaintiffs below
 
 
 217
 'ask the court to disregard the apparent probative effect of their net profit figures (of their entire business) * * * and to consider only that portion of their business related to titanium pigments, in this, they seek to have the court isolate the titanium pigment portion of their business and consider it separate and apart from their other operations. In this way, they attempt to establish the fact that they received a higher return on the titanium pigment * * * in 1949 than upon that which they were able to secure in 1947 and 1918.' Id., 225 F.2d at page 430.
 
 
 218
 Here, if we substitute 'Valencia oranges suitable for single strength juice' for 'titanium pigments,' the language is apt.
 
 
 219
 The record shows that in 1950, the year previous to the one here involved, the oranges sold to Winckler & Smith by Sunkist amounted to but 1.54% Of the total used by Winckler & Smith. From 1948 on, Sunkist had never supplied more than 18%. The balance had been secured from other suppliers, principally Morgan Ward. In 1950, the number of oranges sold by Sunkist to Wincker & smith was reduced to a mere trickle-- 1.54%. This was not claimed to be a proximate cause of the loss of the plant. Yet when Sunkist 'refused' to sell 1.54% Of the total to Winckler & Smith, and other producers refused to sell a larger percentage, appellees contend that the sole proximate cause of the damage suffered, including the loss of the plant, was the appellants' so-called 'refusal.'
 
 
 220
 At the time the plaintiffs below requested oranges from Sunkist the encumbrance on the Winckler & Smith property was in default and a sale on account thereof already set. Thus the loss of the plant, on the evidence in the record before us, becomes collateral, remote and conjectural. Savings Bank of Southern California v. Asbury, 1897, 117 Cal. 96, 48 P. 1081; Hartman v. Rogers, 1886, 69 Cal. 643, 11 P. 581; De Liere v. Goldberg, Bowen & Co., 1916, 30 Cal.App. 612, 159 P. 197. Whether it will remain so on a new trial of the issue of damages, we do not here pass upon.
 
 
 221
 Appellees' proof as to loss of the plant rested on the testimony of Robert Hodge. He just testified that from 1946 to 1949, the company apparently lost $224,000 plus. The net worth of the company was $30,000 on July 31, 1949. From February 1, 1949 to June 31, 1950, the company increased its net worth to $137,000; Operating from February 1, 1950 to January 31, 1951, there was an operating profit of $40,000. From February 1, 1951 to July 31, 1951, there was a loss of $152,000,
 
 
 222
 On April 16, 1951, the , Winckler & Smith Company exercised its option to repurchase the plant which it had previously lost. The company issued 26,325 shares of its preferred stock, paid $17,325 in cash, assumed $50,499,04 on the mortgage, and listed its fixed assets at $721,000 plus, making a capital surplus of $343,000 plus. Exhibit 65 showed that for the year ending January 31, 1952, $156,000 in sales were from Florida processed products, and $528,735,91 from California operations, with a loss of $184,523,20 due to 'less sales in 1952: and 'continuing overhead,'
 
 
 223
 Mr. Hodge, the expert witness, was a Certified Public Accountant, He was not familiar with the accounting of any juice processor other than Winckler & Smith. But he was allowed to testify that if 12,000 tons of fruit had been made available to Winckler & Smith by anyone on the same terms as was made available to TreeSweet, then based on the 1949 and 1950 operations of Winckler & Smith, it would have had a profit of $10,000 in the year ending January 31, 1952. This hypothetical question excluded any reference to conditions in the industry generally in any year, or even to operations of Winckler & Smith in 1951. In explaining his answer, the witness stated he excluded Winckler & Smith's processing costs for 1950, but used only 1949 costs. He used general administrative costs of 1949. He then deducted, not selling costs per ton but 'Winckler & Smith's actual selling cost in the year 1952, as shown in my report, of $87,652.40.'
 
 
 224
 Computed on the same basis, if 15,000 tons had been sold by Sunkist to Winckler & Smith, the profit would have increased from $10,231.45 to $54,026.45.
 
 
 225
 Without going into the credibility of such testimony, or the restrictions placed upon his cross-examination by the court's rulings on evidence, or any particular matters he testified to (as for example, the matter of deferred charges which though actually paid in one year were placed for bookkeeping reasons in another), we fail to find in the hypothetical statement of facts upon which the opinion of this expert was based that fair statement of all the facts in the case which is required as a basis of any hypothetical question. Fort Worth & Denver Ry. Co. v. Janski, 5 Cir., 1955, 223 F.2d 704; Dairymen's Milk Co. of Pittsburgh v, McCormick Co., 3 Cir., 1940, 114 F.2d 736.
 
 
 226
 We are completely, satisfied that the question of appellees' damages, as presented to the jury, rested upon surmise, conjecture, and guess work, and that the amount found as damages was not logically or legally inferable from the facts in evidence before the jury. The expert opinion was a guess based on conditions contrary to fact. It was, in reply to the hypothetical question, too speculative to be admissible. Baush Mach. Tool Co. v. Aluminum Co, of America, 2 Cir., 1935, 79 F.2d 217, 227; Carroll v. Magnolia Petroleum Co., 5 Cir., 1955, 223 F.2d 657.
 
 
 227
 We are satisfied that the jury's determination of liability must be affirmed, and its determination of the amount of damages reversed.
 
 
 228
 D. Was there error in affixing attorneys' fees of $195,000?
 
 
 229
 While it is the duty of this Court 'to protect against 'vicarious generosity' in the matter of attorney fees' (Twentieth Century-Fox Film Corp. v, Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846, 859), we cannot say as a matter of law that in a case like this, tried at great length below; argued twice on this appeal; and now to be reversed partially so that a new trial must be had below on the issue of damages, that before counsel for appellees obtain satisfaction of judgment for their client that $195,000 as attorney's fees is too large a sum, or a figure that would shock the conscience. We do not know what amount will be recovered by appellees on a second partial trial below. When that is determined, finally, the sum heretofore awarded as attorneys' fees may be too large, or conceivably, too small. We cannot prognosticate, not guess. We do not reach that issue. It can be raised below by either side, and if necessary, on subsequent appeal. We will not now disturb it, but assume that on remand the correct amount will be in issue below.
 
 
 230
 The judgment heretofore rendered on the jury's verdict is affirmed on the issue of liability, and reversed and remanded on the issue of the amount of damages.
 
 
 
 [1]
 'In the early 1900's, when agricultural cooperatives were growing in effectiveness, there was widespread concern because the mere organization of farmers for mutual help was often considered to be a violation of the antitrust laws. Some state courts had sustained antitrust charges against agricultural cooperatives, and as a result eventually all the States passed Acts authorizing their existence. It was to bar such prosecutions by the Federal Government as to interstate transactions that Congress in 1914 inserted 6 in the Clayton Act exempting agricultural organizations, along with labor unions, from the antitrust laws.' Maryland and Virginia Milk Producers Ass'n v. United States, supra 362 U.S. at page 464, 80 S.Ct. at page 852
 
 
 [2]
 Maryland and Virginia Milk Producers Ass'n v. United States Supra; Tigner v. State of Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124; United States v. Borden Co., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; United States v. Maryland & Virginia Milk Producers Ass'n, 1949, 85 U.S.App.D.C. 180, 179 F.2d 426; Hinton v. Columbia River Packers Ass'n, 9 Cir., 1942, 131 F.2d 88; United States v. Maryland Cooperative Milk Producers, Inc., D.C.D.C.1956, 145 F.Supp. 151; Cape Cod Food Products v. National Cranberry Ass'n, D.C.D.Mass. 1954, 119 F.Supp. 900; Manaka v. Monterey Sardine Industries, D.C.N.D.Cal. 1941, 41 F.Supp. 531
 
 
 [3]
 Under the true processing or 'custom packing' contract, Exchange Orange furnished fruit to the independent processor for processing into specified products. The processed products were sold under the Sunkist label by the Products Department of Sunkist. The processor was paid its costs plus an assured profit on the processing operations. In 1951, Exchange Orange made such contracts for the processing of hot and frozen concentrate with Hyland-Stanford, Mission Dry, General Foods and Hart's
 
 
 [4]
 Under the so-called 'fruit purchasing' contract, the independent processor agreed to buy all of its by-product fruit requirements from EOP at the going Sunkist price for such fruit at the time of delivery. The processed product was sold by the independent processor under its own label or under the labels of its buyers. The independent was not required to pay for the fruit until such time as it had sold the processed products. In the event the independent stopped buying fruit for its own account, either because of the price of fruit or because its capacity exceeded its own requirements for fruit, tis production facilities were to be made available to EOP upon request. If EOP used such production facilities, the independent was paid costs of operation plus a guaranteed its costs of operation plus a guaranteed profit. This provision of the fruit purchasing chasing contract ties in to the true processing or 'custom packing' contract which EOP sometimes had with the same independent processor
 Finley characterized the so-called 'fruit purchasing' contracts With Hyland-Stanford and Mission Dry as providing for a 'deferred payment' or a 'credit plan,' since the independent processor was not required to pay for the fruit it purchased from EOP until the products processed therefrom were sold by the independent, even though the processed products were, at all times, the property of the independent. Finley said that the provision in such contracts which required the purchaser to buy its full requirements of by-product oranges from EOP assured the independent of a dependable source of supply of fruit. He stated further that the deferred payment privilege afforded the independent under such contracts was given in exchange for the privilege given EOP for 'first call' on the independent's processing facilities.
 
 
 [5]
 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce-- in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.' 250 U.S. 300, at page 307, 39 S.Ct. 465, at page 468
 
 
 [6]
 We discuss the problem without considering the immunities defendant allegedly acquired under both the Capper-Volstead and Clayton Acts. We also note that the general statement in Colgate has reference to a right as it exists under the Sherman Act. More than that was originally plead in this case, but the Robinson-Patman Act violations were dismissed and were not before the jury
 
 
 [7]
 Cf. Rifkind, Division of Territories, in Van Cise and Dunn, How to Comply With the Antitrust Laws, 127, 136 (1954)
 
 
 [8]
 American Bank & Trust Co. v. Federal Reserve Bank, 1921, 256 U.S. 350, 258, 41 S.Ct. 499, 500, 65 L.Ed. 983
 
 
 [9]
 Klor's, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741
 
 
 [10]
 Oppenheim, Selected Antitrust Developments, 15 A.B.A. Section of Antitrust Law 37, 54 (1959)
 
 
 [11]
 4 Restatement, Torts 762
 
 
 [12]
 15 U.S.C.A. 13(a)
 'Section 2(a) of the Robinson-Patman Act, 15 U.S.C. Section 13(a), contains a proviso 'That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade.' In Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55 at 64 (79 S.Ct. 1005, 3 L.Ed.2d 1079) (1959), the Court stated that this proviso codifies the rule of United States v. Colgate & Co., 250 U.S. 300 (39 S.Ct. 465, 63 L.Ed. 992) (1919) * * *.' Oppenheim, op. cit. supra note 10, at 43.
 
 
 [13]
 Handler, Recent Antitrust Developments, 14 Record of the Association of the Bar of the City of New York 318 (1959)
 
 
 [14]
 Oppenheim, op cit. supra note 10, at 43
 
 
 [15]
 Oppenheim, op. cit. supra note 10, at 43-4
 
 
 [16]
 Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847 (1955); Saulnier, Achieving Price Stability as a Basis for Economic Growth in a Free Society, 15 Bus.Law 83 (1959)
 United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, emphasized the narrowness of the path of legality a seller must follow in utilizing the doctrine of United States v. Colgate & Co. in suggesting resale prices to customers. Relying on United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882, and Dr, Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct 376, 55 L.Ed. 502, the Court ruled there were two types of action prohibited by Colgate: (1) agreements or contractual arrangements on a vertical plane, and (2) a concerted plan of action on a horizontal plane.
 'In other words, an unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.' United States v. Parke, Davis & Co., supra, 362 U.S. at page 43, 80 S.Ct. at page 511.
 The unilateral right to set prices, without 'other means' of implementation, leaving the person affected the right to accept or reject the fixed price, is maintained from Colgate, and approved. Cf. also George W. Warner & Co. v. Black & Decker Mfg. Co., 2 Cir., 1960, 277 F.2d 787.
 
 
 [17]
 Justice Black in Klor's specifically said: 'This is not the case of a single trader refusing to deal with another * * *.' (citing United States v. Colgate & Co., supra; United States v. Schrader's Son, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; United States v. Bausch & Lomb Optical Co., supra; Lorain Journal Co. v. United States, supra). Klor's Inc. v. Broadway-Hale Stores, supra, 359 U.S. at page 212, 79 S.Ct. at page 709
 
 
 [18]
 Oppenheim, op. cit. supra note 10, at 44. See Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. Professor Oppenheim goes further: 'Indeed, the cases support an even broader generalization. In the absence of one of the plus illegal elements previously summarized, a seller acting alone is not required by law to justify his refusal to deal. His motive is immaterial unless it is relevant to one of the plus elements mentioned.' Cf. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277; Timberg, Selection of Customers, in Van Cise and Dunn, How to Comply With the Antitrust Laws, 117, 119 (1954), citing Federal Trade Commission v. Raymond Bros.-Clark Co., 1924, 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448
 Also cf. Oppenheim, Developments in Antitrust Law During the Past Year, pp. 29-33, American Bar Association Section of Antitrust Law (1960)
 
 
 [9]
 Klor's Inc. v. Broadway-Hale Stores, supra, 359 U.S. at page 212, 79 S.Ct. at page 709
 
 
 [20]
 Klor's Inc. v. Broadway-Hale Stores, supra, 359 U.S. at page 212, 79 S.Ct. at page 709
 
 
 [21]
 'It is defendants' position, first of all, that they did not have a monopoly of products oranges or a monopoly of the business of processing the oranges and selling the juice in interstate commerce. Defendants contend that such monopolies could have been lawful, if they had existed, because of the statutes relating to marketing associations, but they deny that there were such monopolies
 'With respect to lemons, it is defendants' position that whether Exchange Lemon had a monopoly of products lemons or of the business of processing and selling lemon juice, is immaterial in this case, since, defendants claim, the plaintiff was not in the lemon juice business except in a very minor way.
 'In any event, defendants deny that they misused any power that they may have had with respect to products oranges or lemons.
 'Defendants also deny that they violated the antitrust laws in any way. They deny they combined or conspired with Exchange Lemon, TreeSweet and Silzle, or any of them, to restrain trade and commerce in single-strength Valencia orange juice or and other citrus fruit juice processed in California and sold in interstate commerce, or that they combined or conspired with Exchange Lemon, TreeSweet and Silzle, or any of them, to suppress or eliminate the competition of the plaintiff.
 'Defendants also deny that they combined or conspired with Exchange Lemon, TreeSweet and Silzle, or any of them, to monopolize the market for single-strength Valencia orange juice or any other citrus fruit juice processed in California and sold in interstate commerce, or that they combined or conspired with Exchange Lemon, TreeSweet and Silzle, or any of them, to exclude the competition of the plaintiff from such market.
 'The defendants also deny that they and Exchange Lemon and TreeSweet and Silzle, or any of them, actually monopolized the market for single-strength Valencia orange juice or any other citrus fruit juice processed in California and sold in interstate commerce.
 'With respect to the six acts complained of as causing plaintiff's damage, defendants contend that such acts were lawful and that they were not performed pursuant to any combination or conspiracy or for the purpose of restraining or monopolizing trade and commerce or for the purpose of injuring the plaintiff.
 'It is also defendants' contention that they were under no legal obligation to do business with the plaintiff, and that even if defendants had had some obligation to do business with independent processors generally, there was ample justification for not doing business with the plaintiff.
 'Defendants contend, finally, that what happened to the plaintiff in 1951 was caused, not by any act of the defendants, but by the general economic conditions in the citrus fruit industry and by plaintiff's lack of capital and the mismanagement of its business.'
 
 
 [22]
 'Now, so that you will not be confused, let's back up. Here are co-operatives which are permitted to combine together to produce and market their fruit. The antitrust laws say that they may lawfully do that, and the antitrust laws say that they shall not be in violation of any--are you sleepy down there?
 'Juror Daiker: No.
 'The Court (Continuing):-- shall not be in violation of any antitrust law in so doing.
 'The plaintiffs claim that the defendants did actually have a monopoly of product fruit through their co-operatives. The defendants say, 'We didn't have it. But, if we did, it was legal.' And the court has told you that it was legal. So there is no dispute about that.
 'As the court has told you, the defendants Sunkist, Orange, and co-conspirator Lemon, could have had 100 per cent monopoly of all oranges and lemons grown in Southern California, so that isn't our problem. It is what you find happened or did not happen from there on out.
 'If they had this monopoly control of products oranges, then they could not use it illegally. They could use it legally. Likewise, the plaintiff contends that the defendants conspired and combined to restrain trade and commerce, and conspired and combined to monopolize the citrus fruit market, which is something different from the product fruit.
 'The question that is being left to you as jurors is not the question as to whether these co-operatives could have legally had a monopoly of all the oranges or lemons in California; there is no argument about that; the question on that phase of the case is whether or not, if plaintiff proves they did have such monopoly, did they use it legally or illegally. This is a question of fact. You are the sole judges of the facts.
 'Sections 1 and 2 of the Sherman Act have both the geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of the things forming a part of interstate commerce. If you find that either or both of the defendants combined with TreeSweet or Silzle to eliminate the comcitrus of the plaintiff in the market for citrus fruit juices, particularly single-strength Valencia juice processed in California and sold in interstate commerce, and that any of the acts charged to have been performed by such defendants were performed in furtherance of such combination or conspiracy, and that the performance of any such acts was the proximate cause of any damage to the plaintiff, you should find that there was a violation of the antitrust laws and proximate causation, and you should proceed to the question of damage.
 'Any combination effectively excluding outsiders from the business altogether is a monopoly and is unconditionally unlawful.
 'No claim or contention is made herein by the plaintiff that defendants, or either of them, attempted to monopolize.
 'This may be a technical distinction. There is a charge that they conspired to monopolize. That is different from an attempt to monopolize, to go back to those instructions that I gave you on conspiracy. Attempt to monopolize is something different. For instance, one individual could attempt to monopolize, without any conspiracy. But there is no charge of attempt to monopolize.
 'In considering the matter of monopoly power two ingredients are of outstanding significance: the power to fix prices and the power to exclude competition.
 'The words 'to fix prices,' refer to price fixing activities which tamper with or affect price structures in interstate trade or commerce.
 'Whether monopoly power existed in a defendant or defendants, and whether such power was illegally used or misused, is a question of fact for the jury.'
 
 
 [23]
 'I charge you that the defendant Exchange Orange may legally enter into a processing contract whereby Valencia oranges furnished by Sunkist or Exchange Orange may be processed into single-strength orange juice for Sunkist by an independent processor party to such contract. However, such processing contracts cannot be entered into by Exchange Orange as part of a combination or conspiracy which has the purpose or effect of fixing the prices at which single-strength Valencia juice processed by TreeSweet and Silzle for Exchange Orange may be sold or offered for sale by TreeSweet or Silzle in interstate commerce as such contracts would then be illegal contracts
 'In other words, you have got a question of fact there. Were these legal processing contracts or were they illegal? I am trying to present both sides of the problem to you.'
 
 
 [24]
 For example, alleged errors 2(a), 2(f), 2(g), 2(i), 2(k), 2(s), 2(z) and 2(dd)
 
 
 [25]
 For example, alleged errors 2(z) (2d para.); 3(a)
 
 
 [26]
 For example, alleged errors 2(d) and 2(s)
 
 
 [27]
 ,?or example, alleged errors 2(b), 2(n) and 2(o)
 
 
 [28]
 For example, alleged errors 2(d), 2(e), 2(h) and 2(i)
 
 
 [29]
 For example, alleged errors 2(l), 2(m) and 2(u)
 
 
 [30]
 For example, alleged errors 2(g) and 2(h)
 
 
 [31]
 For example, alleged errors 2(k), 2(l), 2(m), and 2(p)
 
 
 [32]
 For example, alleged errors 2(j)
 
 
 [33]
 'No. 9
 'You are instructed that there was nothing unlawful in the agreement or arrangement entered into in 1951 between Exchange Orange and Exchange Lemon whereby Exchange Lemon processed oranges into single strength orange juice for Exchange Orange at cost and without profit to Exchange Lemon. Unless you find, therefore, from the preponderance of the evidence, that such agreement or arrangement was part of the conspiracy charged in the first causes of action and was made with the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard such agreement or arrangement between Exchange Orange and Exchange Lemon as being of no consequence in this case, so far as the first cause of action is concerned.
 'No. 10
 'You are instructed that there was nothing unlawful in the agreement or arrangement entered into in 1951 between Exchange Lemon and Exchange Orange whereby Exchange Orange processed lemons for Exchange Lemon at cost and without profit to Exchange Orange. Unless you find, therefore, from the preponderance of the evidence, that such agreement or arrangement was a part of the conspiracy charged in the first cause of action and was made with the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard such agreement or arrangement between Exchange Lemon and Exchange Orange as being of no consequence in this case, so far as the first cause of action is concerned.
 'No. 11
 'You are instructed that there was nothing unlawful in Sunkist's setting its own price of by-product Valencia oranges available to independent processors at $40.00 per ton in 1951; and, unless you find, from the preponderance of the evidence, that the setting of such price was a part of the conspiracy charged in the first cause of action and was done for the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard Sunkist's setting of the $40.00 price as being of no consequence in this case, so far as the first cause of action is concerned.
 'No. 12
 'You are instructed that there was nothing unlawful in the contract entered into between defendant Exchange Orange and alleged co-conspirator TreeSweet Products Company, effective as of July 23, 1951; and, unless you find, from the preponderance of the evidence, that such contract was a part of the conspiracy charged in the first cause of action and was made with the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard such contract between defendant Exchange Orange and alleged co-conspirator TreeSweet Products Company, as being of no consequence in this case, so far as the first cause of action is concerned.
 'No. 13
 'You are instructed that there was nothing unlawful in the contract between defendant Exchange Orange and alleged co-conspirator E. A. Silzle Corporation, effective June 26, 1951; and, unless you find, from the preponderance of the evidence, that this contract was a part of the conspiracy charged in the first cause of action and was made with the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard such contract between defendant Exchange Orange and alleged co-conspirator E. A. Silzle Corporation, as being of no consequence in this case, so far as the first cause of action is concerned.
 'No. 14
 ,'you are instructed that there was nothing unlawful in the refusal of defendant Exchange Orange to enter into a processing agreement with plaintiff for processing Valencia oranges during the 1951 season comparable to the contracts entered into between defendant Exchange Orange and alleged co-conspirators Tree-Sweet Products Company and E. A. Silzle Corporation; and, unless you find, from the preponderance of the evidence, that such refusal was a part of the conspiracy charged in the first cause of action and was done with the specific purpose to eliminate and with the effect of eliminating the competition of the plaintiff in the interstate market for canned citrus fruit juice, you will disregard the refusal as being of no consequence in this case, so far as the first cause of action is concerned.'
 
 
 [34]
 'The refusal of EOP, if such you find, to give a contract to plaintiff similar to the Silzle and Tree Sweet Contracts must be judged on the basis of the evidence and instructions in this case and upon such knowledge and information as EOP and its officers, agents and employees had at the time of such refusal, if any, and not upon the basis of facts or information thereafter discovered or ascertained by EOP.'
 
 
 [35]
 Part of the offer of proof was not only that certain persons had the opinion the Winckler & Smith juice was watered, but that 'there is no analytical method known by which it can be determined whether water, sugar, or acid have been added to natural juice in order to compare that with the finished product. It is only possible to determine whether adulterants of that sort have been used by comparing an analysis made before (adulteration) and an analysis made after.' Appellees, apparently surprised at this offer of proof, did not dispute its accuracy, but its admissibility
 
 
 [36]
 'But if it does go into evidence as impeachment, the jury will certainly be told, and told in no uncertain terms what it will nt be considered for, and when I get through telling them what it is not being considered for, I am afraid that the exhibit will not be as effective as the defendants think it might be.'
 
 
 [37]
 'As to the question of damages, that they would go to the question of damages, or causation, alleged inferior product, we are not trying a Food and Drug case
 'As far as we know, maybe people liked orange juice with water in it as well or better than orange juice without water in it, assuming that you could prove that tap water was put in it.'